# United States Court of Appeals
## For the First Circuit

No. 11-2030

STANLEY KOLBE,

Plaintiff, Appellant,

v.

BAC HOME LOANS SERVICING, LP, d/b/a BANK OF AMERICA, N.A.;
BALBOA INSURANCE COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Lipez, Howard, Thompson, and Kayatta,
Circuit Judges.

Edward F. Haber, with whom Todd S. Heyman, Adam M. Stewart, Michelle H. Blauner, and Shapiro Haber & Urmy LLP were on brief, for appellant.
John C. Englander, with whom Matthew G. Lindenbaum, Dennis D'Angelo, William M. Jay, and Goodwin Procter LLP were on brief, for appellees.
Mark R. Freeman, Appellate Staff Attorney, United States Department of Justice, with whom Nancy D. Christopher, Associate General Counsel for Litigation, William C. Lane, Assistant General Counsel for Insured Housing and Community Development Litigation, Bruce S. Albright, Senior Trial Attorney, U.S. Department of Housing and Urban Affairs, Stuart F. Delery, Principal Deputy Assistant, Attorney General, Carmen M. Ortiz, United States Attorney, Michael S. Raab, Appellate Staff Attorney, United States Department of Justice, were on brief, for the United States amicus curiae.

        Frank G. Burt, Denise A. Fee and Jorden Burt LLP on brief for
Property Casualty Insurers Association of America's amicus curiae.
        Elizabeth J. Cabraser, Kelly M. Dermody, Daniel M. Hutchinson,
Lisa J. Cisneros, Lief Carbraser Heimann & Bernstein LLP, on brief
for National Consumer Law Center and AARP amici curiae.
        Stuart T. Rossman on brief for National Consumer Law Center
amicus curiae.
        Jean Constantine-Davis and AARP Foundation Litigation on brief
for AARP amicus curiae.
        Richard L. Neumeier, Morrison Mahoney Miller LLP, Jan T.
Chilton, Michael J. Steiner and Severson & Werson PC on brief for
Mortgage Bankers Association and American Financial Services
Association amici curiae.

---

Opinion En Banc

---

---

September 27, 2013

---

The judgment of dismissal entered by the district court is affirmed by an equally divided en banc court.  See Savard v. Rhode Island, 338 F.3d 23, 25 (1st Cir. 2003) (en banc).

Opinions follow.

**LYNCH, Chief Judge, with whom HOWARD, Circuit Judge, and KAYATTA, Circuit Judge, join.**  The result of the evenly divided vote of the en banc court is to affirm the district court's dismissal of the complaint for failure to state a claim.  See Savard v. Rhode Island, 338 F.3d 23, 25 (1st Cir. 2003) (en banc). This opinion explains why we think that result is correct and required by law.

I.

This is a contract dispute over the terms of a mortgage contract between the borrower, plaintiff-appellant Stanley Kolbe, and the servicer of his loan, defendant-appellee BAC Home Loans Servicing, LP ("BAC" or "the Bank").  Kolbe sued the Bank in a putative class action for damages alleged to have arisen out of the Bank's requirement that he maintain flood insurance in an amount sufficient to cover the replacement value of his home.  Kolbe contends that the Bank, under Covenant 4 of his mortgage contract, cannot require more than the federally mandated minimum flood insurance, which is the lesser of the principal balance of the loan or $250,000 in special flood hazard areas, and $0 in all other areas.  The mortgage is insured by the Federal Housing

-3-

Administration ("FHA"), and Covenant 4 is a standard uniform covenant prescribed by the FHA pursuant to federal law. See 24 C.F.R. § 203.17 (2012); Requirements for Single Family Mortgage Instruments, 54 Fed. Reg. 27,596, 27,603-07 (June 29, 1989) (hereinafter "Mortgage Requirements"). The Covenant was promulgated after notice and comment rulemaking.

We conclude that Kolbe has failed to state a claim for breach of contract. Three interrelated strands of reasoning support our conclusion. The first is straightforward application of the typical principles of contract interpretation. When interpreting a written contract, we look at text, context, and purpose to discover whether a proffered reading of the contract is reasonable. For contract language mandated by a federal regulation, this context includes the regulation and the federal policy underlying the regulatory scheme. As a purely textual matter, the Bank offers the most natural reading of the disputed language. Yet even if an argument exists that Kolbe's textual reading is plausible, context confirms that the Bank's reading is correct and Kolbe's reading is incorrect. As we will describe, particularly under our third strand of reasoning, Kolbe's reading would hinder federal housing policy and conflict with other guidance from the federal government regarding flood insurance. Interpreting the text in context, as we would do with any contract, we conclude that the Bank's reading is correct.

Second, we apply special principles for interpreting uniform contract language. Covenant 4 is a uniform clause used in millions of mortgages nationwide by many different lenders, so we give it one uniform meaning rather than multiple inconsistent meanings. Extrinsic evidence of the parties' unique intentions regarding a uniform clause is generally uninformative because unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties to a contract. Instead, courts seek to determine the uniform meaning of the clause as a matter of law, a task appropriate for the motion to dismiss stage. Kolbe cannot avoid dismissal on the grounds that his specific understanding or the actions of the parties create an ambiguity.

Third, the fact that the Covenant was drafted and mandated by the United States requires that its meaning be that meant by the United States when it drafted the regulation. The role that the Covenant plays in an important regulatory scheme requires that result. The language of the Covenant was not drafted or negotiated by the parties and was not the result of give-and-take in the marketplace. Rather, it was created and mandated in order to further important federal policies. While on the Covenant's plain language and context, we think the meaning is clear, were there doubt, we would defer to the position articulated to us by the United States in its amicus brief; in this case, the

United States' position reinforces our conclusion reached in applying the first two principles.

In its amicus brief to the en banc court, the United States has stated that Kolbe's interpretation is incorrect for a number of reasons, including that it "lacks any anchor in the statutory scheme." Brief for the United States as Amicus Curiae Supporting Appellees at 2, Kolbe v. BAC Home Loans Servicing, LP, No. 11-2030 [hereinafter "United States Brief"]. Further, the United States says that Kolbe's interpretation "serves no practical end, and . . . would seriously undermine federal housing policy." Id. The United States' position as set forth in the brief is entitled to deference; it is well-reasoned and is entirely consistent with its prior interpretations of the clause expressed in various federal publications.

This is an issue for judges to decide. The law does not allow a jury to decide that federal policy is otherwise, or that the contract language required by the United States does not have the eminently reasonable meaning urged by the United States, consistent with the policies that brought about the Covenant in the first instance.

As we will discuss, Kolbe has also failed to state a claim for breach of the covenant of good faith and fair dealing. The district court correctly dismissed all of Kolbe's claims.

Kolbe owns a home in Atlantic City, New Jersey in a special flood hazard area. On October 6, 2008, he borrowed $197,437 from Taylor, Bean & Whitaker Mortgage Corp. ("Taylor Bean") in a mortgage loan secured by his home. The loan was guaranteed by the FHA, a part of the Department of Housing and Urban Development ("HUD").

The mortgage agreement contained a set of Uniform Covenants that are required by HUD regulations to be in every FHA-insured mortgage.[1] One of the Uniform Covenants included in the mortgage is the following provision, which is at issue:

> 4. Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.

The "Secretary" referred to in Covenant 4 is the Secretary of HUD. This case presents the issue of whether the amount of flood insurance required by HUD is a floor or a ceiling.

---

[1] See 24 C.F.R. § 203.17 (requiring an FHA-insured mortgage to "be in a form meeting the requirements of the Commissioner"); Requirements for Single Family Mortgage Instruments, 54 Fed. Reg. 27,596, 27,603-07 (June 29, 1989) (FHA model mortgage form).

Kolbe's home is in an area designated by the Federal Emergency Management Agency ("FEMA") as having "special flood hazards," and as such HUD required (and still requires) that flood insurance must be maintained in "an amount <u>at least</u> equal to either the outstanding balance of the mortgage . . . or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." 24 C.F.R. § 203.16a(c) (emphasis added).[2] The original mortgage holder, Taylor Bean, never required Kolbe to maintain greater flood insurance than the minimum federally required amount, and at all times, Kolbe maintained flood insurance in excess of the outstanding loan balance.

Taylor Bean declared bankruptcy and ceased operations in August 2009. At some point, the Bank became the servicer of Kolbe's loan.[3] In November 2009, the Bank sent Kolbe a letter notifying him that it was requiring him to purchase an additional $46,000 in flood insurance coverage; the Bank has asserted, and Kolbe has not disputed, that this additional insurance would bring Kolbe's total flood insurance coverage to the replacement cost of

---

[2] At all relevant times, the maximum amount of NFIP insurance available for a single family home in a special flood hazard area was $250,000. <u>See</u> 42 U.S.C. § 4013(b)(2). Because the balance of Kolbe's loan was always less than $250,000, the minimum amount of flood insurance required by HUD was always the principal balance of Kolbe's loan.

[3] BAC Home Loans Servicing was a wholly owned subsidiary of Bank of America, N.A., which itself is a wholly owned subsidiary of Bank of America Corporation, the publicly traded company. BAC Home Loans Servicing has merged into Bank of America, N.A.

the property. Kolbe alleges that the Bank had a nationwide policy of requiring flood insurance at a level that often exceeds the principal balance of the loan.

The letter notified Kolbe that if he did not purchase the required flood insurance within about six weeks, the Bank would purchase the insurance at his expense and charge him for the cost, a practice known as "lender-placed insurance"; the letter urged Kolbe to avoid lender-placed insurance by purchasing his own insurance. A second letter reiterated the requirement. Kolbe purchased the insurance on his own; thus the Bank never had to purchase lender-placed insurance on his behalf.

### III.

On February 23, 2011, Kolbe filed a class action complaint in the district court against the Bank alleging it breached the mortgage contract and violated the implied covenant of good faith and fair dealing by requiring the additional flood insurance. The first count of Kolbe's complaint alleged breach of Covenant 4 of the mortgage contract. Under Kolbe's theory, the Covenant precluded the Bank from requiring Kolbe to maintain any flood insurance in excess of the amount required by the Secretary of HUD, which in Kolbe's case was the principal balance of the loan. See 24 C.F.R. § 203.16a(c). The second count alleged a breach of the implied covenant of good faith and fair dealing. This count alleged that "[b]y requiring Plaintiff . . . to maintain

-9-

and pay for flood insurance coverage in excess of the coverage required by [his] mortgage agreement[], Defendants acted in bad faith and breached the implied covenant of good faith and fair dealing . . . ." Kolbe sought to represent a putative class of all other borrowers with similar mortgages owned or serviced by the Bank who were required to purchase flood insurance above the amount of the outstanding balance of their loans.[4] Kolbe also sought a jury trial as to all claims.

On August 18, 2011, the district court granted the Bank's motion to dismiss all claims. The court concluded that the first two sentences in Covenant 4, which allowed the Bank to require insurance for "any hazards . . . in the amounts and for the periods that Lender requires," unambiguously gave the Bank the right to choose the amount of flood insurance it required. Kolbe v. BAC Home Loans Servicing, L.P., No. 11-10312-NMG, 2011 WL 3665394, at *3-5 (D. Mass. Aug. 18, 2011). The district court also dismissed the count for breach of the covenant of good faith and fair dealing because it concluded that the Bank's flood insurance requirement was based on FEMA policy guidelines and was not unreasonable. Id. at *5.

---

[4] The complaint also named as a defendant Balboa Insurance Company ("Balboa"), a subsidiary of the Bank. Kolbe alleged that Balboa prepared and sent the letters requiring the additional flood insurance. The district court dismissed all claims against Balboa, but Kolbe did not press the claims against Balboa in its briefing related to the rehearing en banc, so those claims are not at issue.

-10-

Kolbe appealed, and a divided panel of the First Circuit vacated the dismissal.  See Kolbe v. BAC Home Loans Servicing, LP, 695 F.3d 111, 113-14 (1st Cir. 2012).  The panel majority held that both Kolbe's interpretation and the Bank's interpretation of the contract could be found reasonable by a trier of fact, and therefore that the district court erred in dismissing the breach of contract claim.  Id. at 122.  The panel majority also held that the breach of good faith claim could go forward either on the theory that the Bank intentionally breached the contract, or that the Bank demanded greater insurance based on the improper motivation of potential profit from placement of lender-placed insurance with affiliated companies.  Id. at 123-24.  Judge Boudin dissented, arguing that the contract and federal policy plainly allowed the Bank to require more flood insurance and there was no independent claim under the implied covenant.  Id. at 126-29 (Boudin, J., dissenting).  We granted rehearing en banc, and vacated the panel's decision.  Order, Kolbe v. BAC Home Loans Servicing, LP, No. 11-2030 (1st Cir. Nov. 1, 2012).[5]

---

[5] This case "involves a question of exceptional importance." 1st Cir. R. 35(a)(2).  The disputed provision appears in each of the nearly 7.8 million FHA-insured mortgages nationwide.  Many class action lawsuits presenting precisely the same issue as this case have been filed in federal district courts throughout the country, producing a set of sharply conflicting district court opinions.  Moreover, this case bears on the intersection between two complex statutory and regulatory schemes: the FHA mortgage insurance program meant to promote home ownership, and the National Flood Insurance Program ("NFIP") meant to facilitate flood insurance.

IV.

To interpret Kolbe's mortgage agreement, we start with the legal rules applicable to the construction of this particular contract language.

Contract Interpretation in Light of Context and Purpose

In all contracts, courts must construe contract language in light of the purposes the language was meant to achieve, and in the context of the relevant commercial or regulatory schemes within which the contract is situated. See Simonson v. Z Cranbury Assocs. P'ship, 695 A.2d 222, 224 (N.J. 1997) ("[A] contract should not be construed literally so as to defeat the probable intention of the parties; rather, particular words or clauses may be qualified by the context and given the meaning that comports with the probable intention." (internal quotation marks and citation omitted)); OneBeacon Ins. Co. v. Georgia-Pacific Corp., 474 F.3d 6, 7 (1st Cir. 2007) ("The issue being one of contract interpretation, we look to language and other common indicia (e.g., context, inferred purpose)."); Restatement (Second) of Contracts § 202 cmt. b ("The meaning of words . . . commonly depends on their context. . . . When the parties have adopted a writing as a final expression of their agreement, interpretation is directed to the meaning of that writing in the light of the circumstances."). In particular, contract language must be interpreted in the context of applicable statutes and regulations. See 5 Corbin on Contracts § 24.26, at

-12-

271 (rev. ed. 1998) ("Words and other symbols must always be interpreted in the light of the surrounding circumstances, and the existing statutes and rules of law are always among these circumstances.").

The typical principles of contract interpretation are supplemented by two additional sets of rules of contract construction particularly relevant to Covenant 4: those for construction of uniform clauses, and those for construction of contract language drafted by the United States and required by federal law to be in the contract. Although these principles are applications of the general rule that contracts are interpreted in light of context, the methodology varies somewhat from that used when interpreting a contract with unique language negotiated by the two parties.[6]

---

[6] When two parties draft a contract with language specific to their transaction, the relevant expectations to assess are those of the individual parties to the contract, but even those must be assessed against background and purpose. If there is true ambiguity even against a background which informs the meaning of the language, courts will look to extrinsic evidence of the parties' manifest intentions and expectations to discern the contract's meaning. It is the court that decides whether such ambiguity is present. As a corollary to this principle, when an individually tailored contract is ambiguous, it is inappropriate for a court to resolve a contract dispute on the pleadings, because the outcome will depend on extrinsic evidence that will surface at discovery or at trial. See, e.g., C.A. Acquisition Newco, LLC v. DHL Exp. (USA), Inc., 696 F.3d 109, 113 (1st Cir. 2012).

<u>Uniform Clauses</u>

When a contract uses uniform language that is contained in a large number of contracts, as is the case here, it is a well-established common law principle of contract interpretation that such contracts are "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." <u>Restatement (Second) of Contracts</u> § 211(2). A variety of state and federal courts have acknowledged this principle.[7]

Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant. <u>See, e.g.</u>, <u>Sharon Steel Corp.</u> v. <u>Chase Manhattan Bank, N.A.</u>, 691 F.2d 1039, 1048 (2d Cir. 1982) ("Boilerplate provisions are thus not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate

---

[7] <u>See, e.g.</u>, <u>Vedachalam</u> v. <u>Tata Consultancy Servs., Ltd.</u>, 18 Wage & Hour Cas. 2d (BNA) 1677, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012); <u>Peoples</u> v. <u>Sebring Capital Corp.</u>, 52 Fed. R. Serv. 3d 197, 2002 WL 406979, at *8 (N.D. Ill. Mar. 15, 2002); <u>Fireman's Fund Ins. Cos.</u> v. <u>Ex-Cell-O Corp.</u>, 702 F. Supp. 1317, 1326 (E.D. Mich. 1988); <u>Anderson</u> v. <u>Douglas & Lomason Co.</u>, 540 N.W. 2d 277, 284-85 (Iowa 1995); <u>Kinoshita</u> v. <u>Canadian Pac. Airlines, Ltd.</u>, 724 P.2d 110, 117 (Haw. 1986); <u>Carpenter</u> v. <u>Suffolk Franklin Savings Bank</u>, 346 N.E.2d 892, 897 (Mass. 1976).

provisions is, therefore, a matter of law rather than fact."); 2 Farnsworth, Farnsworth on Contracts, § 7.11, at 304-05 (3d ed. 2004) ("This rule plainly subordinates the meaning that an individual party may have attached to the contract language to the goal of equality of treatment for parties that are similarly situated.").

The issue of interpreting form contract language frequently arises in the context of class action certification.[8] Several federal courts have certified classes for contract disputes over form contracts because the form contracts are interpreted uniformly across members of the class, and thus the outcome does not depend on extrinsic evidence that would be different for each putative class member. See, e.g., Vedachalam v. Tata Consultancy Servs., Ltd., 18 Wage & Hour Cas. 2d (BNA) 1677, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012) ("[I]n construing the form contract between Defendants and class members, the Court need not delve into the actual knowledge of individual class members."); Peoples v. Sebring Capital Corp., 52 Fed. R. Serv. 3d 197, 2002 WL 406979, at *8 (N.D. Ill. Mar. 15, 2002) ("The court also rejects the broader

---

[8] In federal court, requirements for a class action include commonality of legal or factual questions, that the class representative's claims and defenses be typical of those of the class, and (for one category of class actions) that common questions predominate over questions affecting only individual members. Fed. R. Civ. P. 23(a)(2)-(3), (b)(3).

notion that it will generally have to examine the parties' intent on a transaction-by-transaction basis.").

It is undisputed that Covenant 4 is a Uniform Covenant required by HUD for all FHA-insured mortgages, according to a regulation that went into effect after notice and comment. Requirements for Single Family Mortgage Instruments, 53 Fed. Reg. 25,434 (July 6, 1988); see also Mortgage Requirements, 54 Fed. Reg. at 27,596 (final notice issued after receiving comments). In essence, HUD's regulation requires that every FHA-insured mortgage contain a core of Uniform Covenants, while allowing the parties to an individual mortgage to add non-uniform covenants at the end of the contract. For example, Kolbe's mortgage contains about four pages of Uniform Covenants and one page of non-uniform covenants.

That Kolbe's mortgage contract contains uniform HUD covenants is apparent on its face. After information about the address and location of Kolbe's home, the third paragraph states, "THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property." The mortgage then reads, "UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows." Following this heading are sixteen numbered covenants, including the disputed Covenant 4 and Covenant 7, which also has significance to this case. These Uniform Covenants form the heart of the mortgage

contract, covering such topics as principal and interest payments, insurance and taxes, care of the property, grounds for acceleration of debt, and the liability of co-signers.

After the Uniform Covenants, the mortgage reads, "NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows." The mortgage then includes five non-uniform covenants. The bottom left corner of every page of the contract contains the label in capital, boldface type: "NEW JERSEY FHA MORTGAGE." Upon reading the mortgage, it would have been clear to Kolbe or any reasonable person that the mortgage contained nationwide Uniform Covenants, including Covenant 4. It also would have been clear that this was an FHA mortgage, such that federal policy and regulatory pronouncements would be relevant to its interpretation.

Language Drafted By The Government

When dealing with uniform contract language imposed by the United States, it is the meaning of the United States that controls. In interpreting such a government mandated term, a court's assessment of context and purpose is informed by the traditional tools of legislative and regulatory construction. This is a matter of law to be determined by a court. When the United States mandates that private parties use uniform language for a certain type of contract, the United States is enacting a policy that all parties to that type of contract should be subject to

identical obligations.  Those obligations are the ones the United

States intended them to be, as determined by a court, regardless of

the personal interpretation offered by a party.[9]  If such contracts

were subjected to different meanings depending merely on whether a

particular party's interpretation was plausible, it would not only

undermine the efficiency benefits of standardization, but it would

also undermine the federal policy that motivated the United States

to impose uniform contractual obligations on parties in the first

place.  This case demonstrates the necessity of these principles.

The disputed contract language is a Uniform Covenant required by

---

[9] Moreover, any concern that uniform contract language will be used by a powerful party such as a bank to force undesirable terms on a less powerful party such as a homeowner is lessened where the language is imposed on both the bank and the homeowner by a third party, the United States.

Under the doctrine of "contra proferentem," ambiguities in a contract drafted by one party will be interpreted against the drafting party; the "rationale behind that method of interpretation is that '[w]here one party chooses the term of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party.'"  Pacifico v. Pacifico, 920 A.2d 73, 78 (N.J. 2007) (quoting 5 Corbin on Contracts § 24.27); see also Restatement (Second) of Contracts § 206.  A corollary of this doctrine is that insurance policies are interpreted against the insurer and in line with the "reasonable expectations" of the insured, since the insurer typically drafts the policy.  See Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 697 (2d Cir. 1998); Villa v. Short, 947 A.2d 1217, 1226 (N.J. 2008).

When the government mandates the specific contract language, neither party can directly impact the language through superior bargaining power.  Thus, "[t]he rule that language is interpreted against the party who chose it has no direct application to cases where the language is prescribed by law."  Restatement (Second) of Contracts § 206, cmt. b; accord Lass v. Bank of Am., N.A., 695 F.3d 129, 137 (1st Cir. 2012).

federal law for the nearly 7.8 million FHA-insured mortgages nationwide;[10] we therefore seek to find, to the extent reasonable, one uniform meaning, rather than separate meanings that might vary from lender to lender, or even from borrower to borrower.

As one commentator puts it, "if the specified provision is expressly included in the contract in the exact terms required, the provision must be interpreted and given effect in accordance with the intention of the legislature, regardless of what the contracting parties may have understood it to mean."  5 Corbin on Contracts § 24.26, at 278.

Numerous federal and state courts, including the Supreme Court, have affirmed these principles.  In Illinois Steel Co. v. Baltimore & Ohio Railroad Co., 320 U.S. 508 (1944), the Supreme Court adjudicated a contract dispute involving a uniform bill of lading that had been imposed by the Interstate Commerce Commission. The Supreme Court noted that "[s]ince the clauses of the uniform bill of lading govern the rights of the parties to an interstate shipment and are prescribed by Congress and the Commission in the exercise of the commerce power, they have the force of federal law and questions as to their meaning arise under the laws and Constitution of the United States." Id. at 511.  The Supreme Court

---

[10] Office of Risk Analysis and Regulatory Affairs, Federal Housing Administration, Monthly Report to the FHA Commissioner on FHA Business Activity, FHA Portfolios Summary (January 2013), available at http://portal.hud.gov/hudportal/documents/ huddoc?id=jan13.pdf.

then approached the issue as a question of regulatory construction, and decided the purpose and effect of the clause itself.  See id. at 513-16.

Similarly, in Honeywell, Inc. v. United States, 661 F.2d 182 (Ct. Cl. 1981), the Court of Claims (the predecessor to the Federal Circuit) construed a federal procurement regulation that had been incorporated into a government contract.  The court held that under the rules for "regulation interpretation," the agency's interpretation received "controlling weight"; the court rejected the notion that it should "construe[] [the language] in order to give it the effect intended by both parties."  Id. at 186.  See also Saavedra v. Donovan, 700 F.2d 496, 499 (9th Cir. 1983) (noting that when a federal regulation mandated contract terms, the contractual party "had a legal duty to conform to the actual wage determination, not just a contractual duty to conform to plausible interpretations of contract provisions embodying the wage determination"); Lloyd v. Cincinnati Checker Cab Co., 36 N.E.2d 67, 69 (Ohio App. 1941) ("[S]uch statutory provisions [required to be in the contract] are read into the bond or contract 'regardless of the intention of the parties.'  The liability thus created is obviously, therefore, not a contractual liability involving a meeting of the minds, but a purely statutory obligation.").

These principles have also been adopted in New Jersey. See above, note 6.  In Paul Revere Life Insurance Co. v. Haas, 644

A.2d 1098 (N.J. 1994), the Supreme Court of New Jersey interpreted an insurance contract with a provision required by state statute. The court rejected an argument that it should consider the understanding of the insured in interpreting the required provision; rather, the court stated, "A specific provision integrated into the contract by force of a statute, as a matter of public policy, must be interpreted and given effect in accordance with the intention of the legislature, irrespective of how the contractors understood it." Id. at 1106 (quoting Saffore v. Atl. Cas. Ins. Co., 121 A.2d 543, 548 (N.J. 1956) (quoting 3 Corbin on Contracts § 551, at 200-01 (1960))) (internal quotation marks omitted). Although Hass dealt with a state statute, there is no reason the same principle would not apply with full force to a provision required by a federal regulation.

This court therefore must examine the text of the Covenant in light of the purposes for which the United States imposed the language and the context of the relevant regulatory scheme. This is in keeping with the basic common law principle that contract language should be interpreted in light of purposes and context, applied to the particular circumstance of uniform contract language imposed by the United States.

Such an inquiry is appropriate for the motion to dismiss stage because interpreting regulatory text in light of government purposes is a matter of law that is emphatically the province of

judges, not juries. See Northshore Min. Co. v. Sec'y of Labor, 709 F.3d 706, 708 (8th Cir. 2013) ("This dispute involves the interpretation of MSHA regulations, a matter of law that we review de novo."); Marine Polymer Techs., Inc. v. HemCon, Inc., 672 F.3d 1350, 1358 (Fed. Cir. 2012) ("Statutory interpretation is a matter of law that we consider de novo."); cf. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); Diederich v. American News Co., 128 F.2d 144, 146 (10th Cir. 1942) ("The power of the judge to pass upon questions of law is just as much an essential part of the process of trial by jury . . . as is the power of the jury to pass upon questions of fact.").

V.

With these principles in mind, we turn to the Covenant at issue. In performing our task of determining the uniform meaning of the Covenant as a matter of law, we first examine the text in light of its context, then look to the United States' interpretation. We repeat the language of Covenant 4 for convenience, dividing it into its three sentences:

> 4. Fire, Flood and Other Hazard Insurance.
> (1) Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. (2) This insurance shall be maintained in the amounts and for the periods that Lender requires. (3) Borrower shall also insure all improvements on the Property, whether now in existence or

-22-

> subsequently erected, against loss by floods
> to the extent required by the Secretary [of
> HUD].

The Bank argues that in allowing the lender to require its chosen amount of insurance for "any hazards," the first two sentences clearly give the Bank the authority to choose the required amount of flood insurance.[11]  Kolbe argues that the only provision addressing flood insurance in Covenant 4 is the third sentence, and thus the Bank could not require more flood insurance than the amount required by HUD, which (in Kolbe's case) was the principal loan balance.

We agree with the contract interpretation offered by Judge Boudin in his panel dissent.  We adopt and incorporate Judge Boudin's reasoning and expand.  See Kolbe, 695 F.3d at 127-29 (Boudin, J., dissenting).  The Bank offers the only plausible reading of the uniform text, against the context.  As we discuss later, this reading is confirmed by the intent of the United

---

[11] The language of Covenant 4 grants authority to the lender; the Bank is the servicer of Kolbe's loan, and the identity of the lender is unknown.  That distinction does not matter. "[T]ypically, a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan." R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 187 (1st Cir. 2006).  In addition, a HUD regulation states that "the actions of [a mortgagee's] servicer shall be considered to be the actions of the mortgagee."  24 C.F.R. § 203.502(a).  In the absence of any contrary allegations in the complaint, we will presume that as servicer, the Bank was acting as the lender's agent with the lender's full authority.  Indeed, if the Bank were not the lender's agent, the breach of contract claim against the Bank would clearly fail because the lender and not the Bank is a formal party to the contract.

States.  Simply put, the first two sentences allow the Bank to choose the amount of insurance for "any hazards," and that includes flood insurance because floods are hazards.  Dictionary definitions confirm the common understanding that floods are hazards,[12] and even the panel majority acknowledged that "[f]loods unquestionably are a type of hazard, and they are thus literally within the scope of the first sentence."  Kolbe, 695 F.3d at 117 (majority opinion).

Although the third sentence also addresses flood insurance, it adds an <u>independent</u> requirement: that the borrower maintain <u>HUD's</u> minimum level of flood insurance in addition to the <u>lender's</u> minimum.  Because both HUD's and the lender's flood insurance requirements are minimum requirements, they are perfectly consistent, and the borrower can meet both requirements by maintaining flood insurance in the amount of the higher requirement.  Contrary to Kolbe's arguments, there is no need to read the first two sentences to exclude floods in order to avoid

---

[12] <u>Webster's Third New International Dictionary</u> 1041 (2002) (defining "hazard" as "a thing or condition that might operate against success or safety: a possible source of peril, danger, duress, or difficulty"); <u>The American Heritage Dictionary of the English Language</u> 806 (4th ed. 2000) (defining "hazard" as "a possible source of danger"); <u>The Random House Dictionary of the English Language</u> 878 (2d ed. unabridged 1987) (defining hazard as "an unavoidable danger or risk, even though often foreseeable"); <u>Black's Law Dictionary</u> 786, 1253 (Bryan A Garner ed., 9th ed. 2009) (defining "hazard" as "[d]anger or peril; esp., a contributing factor to a peril," and defining peril as "<u>Insurance.</u>  The cause of a risk of loss to person or property; esp., the cause of risk such as fire, accident, theft, forgery, earthquake, <u>flood</u>, or illness" (emphasis added)).

-24-

making any provision superfluous, or to resolve a conflict between a specific provision and a general provision under principles of contract interpretation.[13]

The Bank's interpretation is also more consistent with another covenant of the contract, Covenant 7, as we explain in another section below. This Covenant empowers the lender to purchase insurance to "protect the value of the Property," suggesting that the lender's economic interests are not limited to the principal balance of the loan.

Kolbe also argues that the title of Covenant 4--"Fire, Flood and Other Hazard Insurance"--supports his reading. Kolbe argues that the title signifies that the paragraph deals separately with fire insurance and flood insurance. Because the first sentence refers to "hazards . . . including fire," but does not mention floods, while the third sentence singles out flood insurance, Kolbe concludes that only the first sentence deals with

---

[13] According to a canon of contract interpretation, a specific provision will sometimes control the meaning of a more general provision on the same subject. This is a useful rule of thumb where two clauses conflict, because in that circumstance it will be necessary to disregard one provision or the other. See 2 Farnsworth on Contracts § 7.11, at 297 ("If, however, two provisions in a contract so clearly conflict that both cannot be given full effect, it is assumed that the more specific the provision, the more likely it is to reflect the parties' intention."). Yet when two provisions are consistent, disregarding the more general provision is not necessary to resolve a conflict, and in fact would fail to give full effect to each provision.

fire insurance and only the third sentence deals with flood insurance.

This argument is a non sequitur. The first sentence covers "<u>any</u> hazards, . . . including fire" (emphasis added). In the context of a sentence covering "any hazards," the listing of fire as an example clearly does not imply an exclusion of other hazards. It would be unnatural and illogical to read "any hazards, . . . including fire" to mean "all hazards except floods." The government flood insurance requirement is mentioned separately in the final sentence to comply with National Flood Insurance Act (NFIA) and HUD legal requirements regarding flood insurance. <u>See</u> 42 U.S.C. § 4104a(a)(3); 24 C.F.R. § 203.16a(a)(2). The title merely reflects that flood and fire are two kinds of hazards that are specifically mentioned in the Covenant. If anything, the phrasing of the title supports the Bank. By using the phrase "Other Hazard Insurance" after listing fire and flood, the title says that both fire and flood are instances of hazards, which leads to the conclusion that flood insurance is included in the first sentence.

We conclude that the Bank's reading of the text, is the only plausible reading in the relevant context.[14] For contract

_____

[14] Indeed, Kolbe's interpretation would lead to unreasonable results, such as preventing lenders from requiring any flood insurance in homes at moderate flood risk, and is contrary to government policy as we describe below.

language mandated by a federal regulation that implicates the federal mortgage insurance and flood insurance programs, this context includes the broader regulatory schemes and the federal policy underlying those schemes. In essence, when this covenant is understood in context against its purposes and federal housing policy, the only reasonable interpretation of this language is that offered by the Bank. An examination of the context removes any claim of ambiguity.

Covenant 4 traces its origins to a HUD regulation that bears directly on the question at hand. The regulation is titled "Mortgagor and mortgagee requirement for maintaining flood insurance." 24 C.F.R. § 203.16a. In pertinent part, that regulation states that both the mortgagee and the mortgagor must "obtain and . . . maintain NFIP flood insurance coverage on the property improvements during such time as the mortgage is insured." Id. § 203.16a(a)(2). As to the amounts, the regulation states: "The flood insurance must be maintained such time as the mortgage is insured in an amount <u>at least</u> equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." Id. § 203.16a(c) (Emphasis added.).

And there is good reason why HUD required lenders and borrowers to "maintain" flood insurance in "at least" certain

-27-

amounts, and not in "no more" than certain amounts, as Kolbe would have it. As the United States said at oral argument[15]:

> And there are good reasons for that. The first is that in a normal case [the] borrower defaults, the bank forecloses on the property--assigns it to HUD and then walks away. And HUD pays them the insurance proceeds of the mortgage insurance. Then HUD is responsible for selling the property and reimburses the mortgage insurance fund with the proceeds of the sale. But of course if the house has been destroyed by a flood--there is nothing for HUD to sell. And so there is no way to reimburse the mortgage insurance fund and that is why HUD regulations have specifically provided since 1971, that flood damage has to be repaired by the lender before the property can be re-conveyed.

In its brief, the United States also explains the unreasonable consequences that would result from Kolbe's reading. In response, Kolbe argues that federal policy supports his interpretation. He also argues that the position of the United States articulated in the brief is entitled to no deference because (a) it is stated in an amicus brief, and (b) in his view, it is inconsistent with the position the United States took earlier.

Before addressing the policy arguments, we provide background on the relevant regulatory schemes to explain the arguments and our conclusion.

---

[15] We acknowledge that the panel did not have before it any explicit articulation of the position of the United States, but the en banc court now has this articulation.

<u>Federal Flood Insurance and Housing Policy</u>

Two federal statutory and regulatory schemes factor into this case: the National Flood Insurance Act ("NFIA") and the FHA's mortgage insurance program.  In 1968, Congress passed the NFIA, 42 U.S.C. §§ 4001-4129, to make flood insurance available and to promote the use of flood insurance in areas of the country with flood risk, <u>see</u> <u>id.</u> § 4002(b) (declaration of congressional purpose).  Congress found that floods caused substantial economic and personal hardships, but that it was not economical for private insurance companies to provide flood insurance.  <u>Id.</u> § 4001(a),(b).  To remedy the situation, Congress authorized a program in which the United States would partner with private insurance companies to provide flood insurance.  <u>Id.</u> § 4001(b)-(d).

Under the National Flood Insurance Program (NFIP), the United States makes flood insurance available in states and communities that agree to participate in the program.  42 U.S.C. § 4012(c).  In flood-prone areas (<u>i.e.</u>, those deemed "areas having special flood hazards" by FEMA) where flood insurance is available, the NFIA <u>requires</u> federally regulated lenders not to make mortgage loans unless the borrower obtains flood insurance at least up to the full principal balance of the loan (or in the maximum amount available, if that is less).  <u>Id.</u> § 4012a(b)(1).  In addition, federal financial assistance for homes in special flood hazard areas is <u>forbidden</u> unless the home is covered by flood

insurance at least equal to the lesser of the loan balance or the maximum amount available. Id. § 4012a(a). Although the insurance is provided by private insurers to the extent possible, id. § 4011(c), the United States supports the program by offering subsidy payments and reinsurance to the private insurers, id. § 4054, 4055.

The FHA was created in 1935 as a result of the National Housing Act of 1934, 12 U.S.C. § 1701 et seq.. The FHA promotes affordable home ownership by providing mortgage insurance to private lenders, cf. id. § 1709; Mission/U.S. Department of Housing and Urban Development (HUD), http://portal.hud.gov/ hudportal/HUD?src=/about/mission (last visited May 16, 2013) (mission statement of HUD to "create strong, sustainable, inclusive communities and quality affordable homes for all"). If a borrower defaults on an FHA-insured mortgage, the lender can convey the mortgage or title to the property to HUD and collect insurance benefits from the United States to compensate for any losses on the mortgage. See 12 U.S.C. § 1710. However, if the property has suffered damage from "fire, flood, earthquake, hurricane, or tornado," then the lender cannot collect insurance benefits from the United States unless it has repaired the damage or taken a deduction from the insurance benefits for the cost of repairing the damage. 24 C.F.R. § 203.379 (emphasis added). Effectively, this scheme allocates the risk of most defaults on FHA-insured mortgages

to the United States, but it allocates the risk of certain hazard losses (including flood losses) to the lender.

Policy Arguments

Given this background and context, it is not surprising that the United States is able to confirm that HUD has "never endorsed such a policy" of construing Covenant 4 as "a federal ceiling for flood insurance coverage rather than a floor." The United States explains that Kolbe's reading conflicts with the overall structure of FHA mortgage insurance. HUD's mortgage insurance program places the risk of flood and other hazard losses on the lender, see 24 C.F.R. § 203.379, and so gives the lender the authority to determine the amount of flood insurance necessary to protect its investment. As the United States describes, "[t]hat is the purpose of Paragraph 4: because the lender ultimately bears the risk of uninsured hazard losses, FHA's standard mortgage contract allows the lender to specify the types and amounts of all hazard insurance--including flood insurance--that the borrower must carry." United States Brief at 15.

In addition, Kolbe's interpretation of Covenant 4 would lead to anomalous and untoward results. Under Kolbe's reading of Covenant 4, the only sentence addressing flood insurance is the third sentence, which obligates the borrower to maintain insurance in the amount required by the Secretary of HUD. But HUD only requires flood insurance in special flood hazard areas. Thus,

-31-

under Kolbe's reading, a lender could not require a penny of flood insurance for homes in moderate flood risk areas. Special flood hazard areas are defined as areas subject to at least a one percent chance of flooding in any given year, which equates to a twenty-six percent chance of flooding over the course of a thirty year mortgage.[16] Homes in moderate flood risk zones, while falling short of the risk threshold for a special flood hazard area, may nonetheless face significant flood risk. In fact, over twenty percent of NFIP flood-insurance claims and about one third of federal disaster relief payments for flooding are related to properties outside of special flood hazard areas. National Flood Insurance Program, Flood Facts, http://www.floodsmart.gov/floodsmart/pages/flood_facts.jsp. There would be no reason to forbid the lender from requiring any flood insurance on such homes, yet allow the lender to require as much insurance as it wishes for other hazards that are extremely unlikely to occur, such as earthquakes or tornados in certain parts of the country. Such an irrational policy objective could not plausibly be attributed to HUD, and the United States' brief confirms that HUD did not intend such a result.

The result urged by Kolbe would seriously impair federal housing policy as articulated by the United States. Kolbe's

---

[16] See 44 C.F.R. § 59.1; National Flood Insurance Program, What is a Special Flood Hazard Area (SFHA)?, http://www.floodsmart.gov/floodsmart/pages/faqs/what-is-a-special-flood-hazard-area.jsp.

interpretation would prevent lenders in some cases from requiring adequate flood insurance, particularly for homeowners with mortgages above $250,000 (the maximum federal requirement) or homes outside of special flood hazard areas, where the United States does not require any flood insurance. United States Brief at 21-22. Kolbe's interpretation would not only frustrate HUD policy, but it "is impossible to reconcile with Congress's objective in the [NFIA], which was not to prohibit the use of flood insurance in federally insured housing but to encourage it." Id. at 24. The United States finds it foreseeable that lenders would react to Kolbe's interpretation by "declin[ing] to offer FHA-insured loans in areas facing even marginal flood risks, or charg[ing] substantially greater interest rates for such loans," thus hindering affordable home ownership. Id. at 24.

Kolbe and supporting amici posit that federal housing policy could support their contract reading. These policy arguments revolve around the fact that a primary purpose of HUD and the FHA is to promote affordable home ownership. Because flood insurance can be expensive, a provision limiting the lender's ability to require flood insurance could reduce one component of the initial cost of home ownership for FHA borrowers.

This argument that the policy of lowering housing costs supports Kolbe's interpretation is anchored in speculation rather than the record of the Covenant's actual context and purpose.

-33-

Moreover, its economic assumptions do not bear scrutiny. Restricting the amount of flood insurance only reduces the buyer's monthly payment if the lender, so restricted, fails to factor the increased risk into the interest rate charged. Kolbe also ignores the fact that the purchase of flood insurance results in either an increase in home ownership costs (in the event of no flood) or a decrease in home ownership costs (in the event of a flood). And Kolbe offers no evidence that the FHA somehow considered the risk-adjusted balance of the effects on costs to be detrimental to consumers. In short, the notion that the FHA wanted to make sure that consumers could under-insure for flood loss is complete and improbable speculation.[17] And this interpretation by the United States was provided before Kolbe entered into his mortgage with Taylor Bean, as discussed below.

Kolbe further dismisses the United States' brief as a "newly minted interpretation [that] is flatly inconsistent" with past HUD practice. This is simply not so. Earlier HUD pronouncements support the United States' present assertions and the Bank's interpretation, and are inconsistent with Kolbe's interpretation.

Kolbe's inconsistency argument is largely based on HUD handbooks and guidance documents that list "flood insurance" and

_____

[17] The Covenant would also be a poor way even to lower up front housing costs, as it would provide much more benefit for those able to afford the most expensive homes.

"hazard insurance" as separate categories.[18] Kolbe argues that these documents show that HUD has long treated hazard insurance and flood insurance separately, reflecting a broader industry practice of excluding flood coverage from hazard insurance policies. Because HUD and industry practice treat hazard insurance and flood insurance as separate categories, Kolbe asserts that the mention of hazards in the first sentence should be read to exclude floods. The panel majority found this separation to be significant. It is, but the difference reinforces the Bank's reading.

Kolbe's argument confuses the question at issue. The question is not whether the category of "hazard insurance" includes "flood insurance"; the question is whether floods are hazards, and thus whether a reference in Covenant 4 to "any hazards" includes floods. On this question, both HUD practice and the pattern of industry usage favor the Bank and the United States' interpretation, not Kolbe's.

We explain why. In the middle of the twentieth century, insurance companies began issuing comprehensive hazard insurance

---

[18] A HUD handbook on insured mortgages lists "hazard insurance" and "flood insurance premiums" as separate items that must be paid into an escrow account. See HUD Handbook 4330.1, ch.2, § 2-1(D), available at http://portal.hud.gov/hudportal/HUD?src=/ program_offices/administration/hudclips/handbooks/hsgh/4330.1. A HUD guidebook on settlement costs separately lists "Hazard Insurance Premium" and "Flood Insurance" as separate settlement costs. See "Buying Your Home" (June 1997), Section III, available at http://portal.hud.gov/hudportal/documents/huddoc?id =DOC12893.pdf.

policies that covered against a wide variety of risks. Crusto, The Katrina Fund: Repairing Breaches in Gulf Coast Insurance Levees, 43 Harv. J. on Legis. 329, 334 (2006). These comprehensive hazard insurance policies consist of "named peril" policies that only cover an enumerated list of hazards, and "all-risk" policies that cover all physical hazards except those specifically excluded. Thomas & Randall, New Appleman on Insurance Law § 41.02[1][a], at 41-15 (library ed. 2011).[19] More recently, all-risk policies have eclipsed named peril policies as the most common form of homeowners insurance. Id. § 42.02[1], at 42-60. Yet virtually all standard hazard insurance policies, including all-risk policies, contain a specific "flood exclusion" provision that excludes flooding and water damage from coverage. Id. § 43.02[3][a], at 43-14.

The fact that HUD documents list "flood insurance" and "hazard insurance" as separate categories reflects the reality that homeowners who want flood insurance will need to purchase it separately from an all-risk hazard insurance policy. It does not support an inference that HUD is stating that floods are not hazards; rather, it is stating the opposite. The reason that such an express flood exclusion is necessary in a hazard insurance

---

[19] In insurance industry parlance, the terms "hazard," "peril," and "risk" are often used interchangeably. See Black's Law Dictionary 786, 1442 (Bryan A Garner ed., 9th ed. 2009) (defining "hazard" as "Danger or peril" and defining "risk" as "Insurance. The type of loss covered by a policy; a hazard from a specified source").

policy covering all risks is because flooding is considered a risk (or alternatively, a hazard), and thus would be covered by the hazard insurance policy absent such an exclusion.

HUD regulations and the NFIA confirm the industry understanding that floods are hazards. For example, HUD requires flood insurance on FHA-insured mortgages in "area[s] having special flood hazards." 24 C.F.R. § 203.16a(b); see also 42 U.S.C. § 4012a(a) (mandating that federally regulated lenders require flood insurance on homes in "area[s] having special flood hazards").

Other HUD pronouncements, including a different part of the 1994 HUD Handbook cited by Kolbe, also support the United States' interpretation but contradict Kolbe's interpretation. As we have noted, under Kolbe's interpretation, a lender cannot require any more flood insurance than what HUD requires, which would mean zero flood insurance outside of special flood hazard areas. Yet HUD has been quite clear on multiple occasions that lenders can require flood insurance outside of special flood hazard areas.

For example, in a 1990 letter to mortgagees of FHA-insured loans, the FHA Commissioner wrote, "[l]enders are free to consider requiring flood insurance in participating communities on the basis of their own business judgement, even if the building that is the security for a loan is located outside of an SFHA [special flood hazard area]." Mortgage Letter 90-16, 1990 WL

10022448, at *2.  A handbook issued by HUD in 1994 states, "In areas designated B and C (with suffixes) [on FEMA maps], [flood] insurance is available but not required by HUD (although mortgagees may require it under the same terms and conditions as those that apply to other dwelling insurance)."  HUD Handbook 4330.1, 2-11(E)(2) (emphasis added).

Quite significantly, FEMA recommended in its 2007 guidelines that lenders do precisely what the Bank did: require homeowners in special flood hazard areas to maintain replacement cost flood insurance.  See FEMA, National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines 27 (2007).[20]  We will not read HUD regulations as preventing lenders from following FEMA flood insurance guidelines with respect to FHA-insured mortgages.  See Mortgage Letter 90-16, 1990 WL 10022448, at *1 ("[W]e want to bring HUD policy in conformance with that of FEMA.").

Kolbe raised another example of purported inconsistency at oral argument.  Kolbe notes that the 1994 HUD Handbook states that a lender "may not insist on more [insurance] coverage than is

---

[20] The 2007 guidelines were in effect at the time that Kolbe entered into his mortgage and at the time the Bank required the additional flood insurance.  The United States has notified this court in a letter that FEMA has rescinded the 2007 guidelines as outdated, but that "it remains the policy of FEMA that . . . prudent mortgage lenders may often wish to require borrowers to carry more than the minimum amount of flood insurance coverage required by federal law . . . ."

necessary to protect its investment."   HUD Handbook 4330.1, 2-11(B).   He argues that only insurance in the amount of the principal loan balance is necessary to protect the lender's investment; thus, this handbook limited the lender's discretion and thereby conflicts with the conclusion of the United States' brief.

Kolbe's argument fails for several reasons, including that its factual premise is untrue.  First, his argument conflicts with Covenant 7 of the mortgage contract.  Covenant 7 is the force-pay provision that not only allows the lender to protect itself when the borrower fails to comply with his obligations, including those under Covenant 4, but also allows the lender to charge the borrower for the resulting cost incurred by virtue of the borrower's breach.  It provides that "[i]f Borrower . . . fails to perform any . . . covenants and agreements contained in this Security Instrument, . . . then Lender may do and pay whatever is necessary to protect value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance . . . . Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower . . . ."  The two covenants must therefore be read together in a manner that aligns duty, breach, and remedy.   That alignment appears perfectly and plainly if Covenant 4 is read, as we read it, to allow the lender to require the borrower to procure flood insurance up to an amount necessary to protect the value of the property.  Conversely, under Kolbe's

view, the Covenant 4 duty is only to buy flood insurance in amounts that will often be far less than that necessary to protect the value of the property, but the remedy for a breach of that duty, under the plain language of Covenant 7, is that the borrower may be required to reimburse the lender for the cost of flood insurance for the full amount necessary to protect the value of the property.

Second, FEMA's guidelines confirm the fact, described by the United States in its amicus brief, that the lender has an economic interest in the borrower maintaining replacement cost flood insurance. Finally, it is a matter of common sense that a lender has an interest not only in the principal balance of the loan but in maintaining a performing loan that will provide a stream of interest payments; if the borrower has enough insurance to rebuild his home in the event of a flood, it is more likely that the borrower will remain current on the loan and continue to make payments.

We again explain why three strands of reasoning support our conclusion. Using the ordinary tools of contract interpretation, we view the text of Covenant 4 in the context of federal housing policy. This examination convinces us that the Bank's interpretation is correct. Because this covenant is a uniform clause, we determine its uniform meaning as a matter of law, and do not allow Kolbe to vary from that meaning on the basis of extrinsic evidence unique to his transaction. This leads into

the third strand: the fact that this language was drafted and imposed by the United States in a regulation. On this record, we think the Covenant's purpose is plain.

We have no doubts about the meaning of Covenant 4 under any of the three tests, but if we did, we would resolve those doubts by deferring to the United States' reasonable interpretation. See Auer v. Robbins, 519 U.S. 452, 461 (1997). Under the doctrine of "Auer deference," we accept an agency's interpretation of its own regulation "unless 'plainly erroneous or inconsistent with the regulation.'" Id. (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)).[21]

Although Covenant 4 appears in a contract between private parties, it derives from a duly enacted HUD regulation, in which HUD promulgated the language and mandated that private parties include the language in mortgage contracts for FHA-insured mortgages. See Mortgage Requirements, 54 Fed. Reg. at 27,603-07. Auer deference applies here just as it does to any other agency interpretation of a regulation. Indeed, multiple courts of appeals

---

[21] Although the Supreme Court commonly refers to this doctrine as "Auer deference," see, e.g., Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1337 (2013), the doctrine actually originated decades earlier in Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945) ("[T]he ultimate criterion is the administrative interpretation [of the regulation], which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."). We follow the Supreme Court's lead in referring to Auer deference, but we note that the doctrine has a much longer pedigree, and many of the decisions applying it were issued well before Auer.

have accorded deference to agency interpretations of contract terms that were promulgated and mandated by a federal regulation. See Saavedra v. Donovan, 700 F.2d 496, 499 (9th Cir. 1983) (according "deference to an agency's reasonable and conforming interpretation of its own regulation"); Honeywell Inc. v. United States, 661 F.2d 182, 185 (Ct. Cl. 1981) ("[I]n construing administrative regulations, the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. . . . The fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation.").[22]

Applying Auer deference, it is a simple matter to uphold the United States' interpretation of Covenant 4, which accords with the Bank's interpretation. Far from being "plainly erroneous or inconsistent with the regulation," the United States' interpretation is consistent with the most natural reading of the regulation's text. Further, it is supported by persuasive articulations of federal policy as discussed earlier and contained in the United States' brief.

Kolbe insists that Auer deference is inappropriate, citing to Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156

---

[22] In our case, moreover, the United States is not a party to the litigation, hence one possible reason for hesitating to defer to its position is absent.

(2012), a case in which the Supreme Court rejected and refused to extend _Auer_ deference to a United States brief that was inconsistent with past agency practice and the governing statute. The agency in _Christopher_ submitted a brief declaring an industry practice illegal, but the Court noted that this brief was inconsistent with decades of declining to bring enforcement actions, which created a justified expectation that the practice did not violate the relevant regulations. _See id._ at 2167-68.

This case is distinguishable from _Christopher_. Nothing in HUD's past practice is inconsistent with the position articulated in its brief. To the contrary, HUD has declared in the past that lenders can require flood insurance above HUD requirements outside of special flood hazard areas, which supports the position in its brief but is inconsistent with Kolbe's position. _Christopher_ provides no support for rejecting _Auer_ deference in this case.

We stress that _Auer_ deference is not necessary to our conclusion. Even if Kolbe were correct that _Christopher_ governs this case, he would still lose. In _Christopher_, while rejecting _Auer_ deference, the Court granted the agency a lesser measure of deference derived from _Skidmore_ v. _Swift & Co._, 323 U.S. 134, 140 (1944): "deference proportional to the 'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those

factors which give it power to persuade.'" <u>Christopher</u>, 132 S. Ct. at 2169 (quoting <u>United States</u> v. <u>Mead Corp.</u>, 533 U.S. 218, 228 (2001)).  Here, the United States' brief contained thorough consideration and valid reasoning, was consistent with other HUD pronouncements, and was persuasive of its own force.  The lesser <u>Skidmore</u> deference easily would have sufficed to sustain its interpretation.  Indeed, we would agree with the United States' interpretation even if we gave it no deference at all.  Kolbe has failed to state a claim for breach of contract.[23]

---

[23] Kolbe has briefly articulated two other theories for breach of contract.  First, Kolbe argues that the contract did not allow the lender to <u>increase</u> the amount of required flood insurance during the pendency of the loan.  This contention is belied by the language of the contract, which requires the borrower to maintain insurance "in the <u>amounts</u> and for the <u>periods</u> that Lender requires," implying that the lender can require different amounts of insurance in different periods.

Second, Kolbe argues that because Taylor Bean only required the principal balance amount of flood insurance, its conduct suggests that it believed it could not require additional flood insurance.  This argument is off base.  This uniform contract has a uniform meaning that does not depend on the intent of the specific parties.  But even if it did, Taylor Bean's decision not to require more insurance more likely reflects a business judgment that more insurance was not economically necessary, rather than a legal judgment that it could not require more insurance. Moreover, the United States has explained that the purpose of Covenant 4 is to allow individual lenders to make business judgments about how much flood insurance to require.  United States Brief at 2.  That is precisely what happened here, with Taylor Bean requiring the amount of the principal balance and the Bank requiring replacement cost value.

VI.

The claim for breach of the covenant of good faith and fair dealing also fails. In every contract, there exists an implied covenant of good faith and fair dealing. Kalogeras v. 239 Broad Ave., L.L.C., 997 A.2d 943, 953 (N.J. 2010). Under this covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (quoting Palisades Props., Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)) (internal quotation marks omitted). In addition, where a contract grants a party discretion, the party must exercise that discretion reasonably. Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1130 (N.J. 2001). Kolbe's complaint contains only a single allegation that the Bank breached the implied covenant: "By requiring Plaintiff and the Class to maintain and pay for flood insurance coverage in excess of the coverage required by their mortgage agreements, Defendants acted in bad faith and breached the implied covenant of good faith and fair dealing contained in the mortgage agreements." This allegation is wholly dependent on the premise that the Bank breached the contract, and it therefore fails with the failure of the breach of contract claim.

By failing to allege it in his complaint, Kolbe has waived any other claim regarding the covenant of good faith. Even if we were to assume in Kolbe's favor that he preserved this

argument, raised for the first time on appeal, that "the only reason Defendants demanded additional flood insurance was an improper effort to self-deal . . . collecting for itself or its affiliates insurance brokerage commissions and excessive premiums," it fails. Kolbe's self-dealing claim fails the standard of plausibility necessary to survive a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Kolbe's allegations do not support a plausible inference that he personally has suffered any injury or that the Bank has abused him.

The Bank sent Kolbe a letter in which it urged him to purchase his own insurance.[24] This letter gave Kolbe about six weeks notice to purchase his own insurance. It warned Kolbe of the potential negative consequences of lender-placed insurance, stating that the insurance "may be more expensive and will likely provide less coverage than was previously in effect or that you can obtain on your own," as well as mentioning the potential commissions. The letter implored him to purchase his own insurance: "We encourage you to act now and obtain flood insurance in the necessary amounts to avoid incurring the cost of our buying Lender-Placed Insurance." The Bank followed up a month later with a second letter, again

---

[24] The letter told Kolbe that the Bank had recently discovered the flood insurance coverage was not adequate, and the additional coverage required was $46,000. If Kolbe did not agree that the property was in a special flood hazard area, as the mortgage documents reflected, Kolbe was to notify the Bank. Kolbe did not and has not ever disputed that his property is in a special flood hazard area.

notifying Kolbe of the insurance requirement and stating that he could avoid lender-placed insurance by purchasing his own insurance.[25] The Bank's disclosure and warning hardly support a claim of abusive self-dealing.

Of course, Kolbe did purchase his own insurance, presumably at a fair market rate. The Bank did not force-place any insurance, and thus did not collect any commissions or premiums from Kolbe. Kolbe did not suffer any harm; the only "injury" he claims to have suffered is from the cost of obtaining his own insurance. But, as we have said, the requirement that he do so was legal, and so there was no injury. He may not raise a claim, apparently on behalf of others, that affiliates of the Bank collected and profited from commissions or premiums on lender-placed insurance. Further, even as to that issue, Kolbe's complaint makes no allegation that plausibly suggests that his lender required he obtain additional flood insurance beyond an amount necessary to protect the lender's legitimate interests, or that it required him to purchase anything at all from the lender or anyone associated with the lender. To the contrary, the very letters to which Kolbe points in his complaint make clear that, in requiring the additional coverage, the lender urged Kolbe-twice-to

---

[25] Kolbe appended only the first page of the letter to his complaint, and the full letter does not appear in the district court or appellate record. It is unclear whether the later pages of the letter also include the same warnings about the negative aspects of lender-placed insurance that are in the first letter.

obtain the insurance on his own from someone other than the lender. In short, taking Kolbe's allegations on their face, they fail to make out any claim for a breach of the lender's contractual commitments, express or implied.

Kolbe and supporting amici have attempted to turn this case into a broader hearing on alleged abuses in the practice of lender-placed insurance.[26] That is a separate problem, and one independent of the clause we have construed.

Accepting Kolbe's allegations as true, he ended up with more insurance than he would have chosen to purchase on his own, but he unquestionably received value for the additional cost: sufficient insurance to rebuild his home in the event of a flood. We take judicial notice that the Atlantic Coast suffered a major flood last fall from Hurricane Sandy; the damage was so significant that Congress appropriated $9.7 billion to replenish the NFIP's insurance fund, and an additional $51 billion to aid storm victims. Final Passage by Congress to $51 Billion in Storm Aid, N.Y. Times, Jan. 29, 2013, at A21; Congress Approves $9.7 Billion in Insurance Aid for Hurricane Victims, N.Y. Times, Jan. 5, 2013, at A14. Kolbe's hometown of Atlantic City sustained significant damage. Empty of Gamblers and Full of Water, Atlantic City Reels, N.Y.

---

[26] Kolbe and supporting amici have argued at various points during the appeal that lender-placed insurance involves frequent abuse by banks that place insurance policies at excessive prices and then split the profits with insurers. That is not the case that Kolbe has pled or could plead.

-48-

Times, Oct. 30, 2012, at A1.  This event served as a sad reminder of the value of replacement cost flood insurance for homeowners, particularly in flood-prone areas.  Further, the Bank did not act unreasonably in requiring this insurance.  The Bank was following FEMA's guidance, and as discussed above, the increased insurance protected the Bank's reasonable and legitimate economic interests.

Kolbe's complaint fails to state a claim for relief, and the district court correctly granted the motion to dismiss.

## VII.

This opinion does not attempt to respond to the opposing opinion written by Judge Lipez for himself and two of our colleagues.  Rather, the opinion of Judge Kayatta does respond, and I join him.

**LIPEZ, <u>Circuit Judge</u>, with whom TORRUELLA, <u>Circuit Judge</u>, and THOMPSON, <u>Circuit Judge</u>, join.** Appellant Stanley Kolbe claims that he and his mortgage lender agreed in 2008 that his obligation to buy flood insurance was capped at the amount of his outstanding principal balance, consistent with their common understanding of a uniform covenant included in all mortgages insured by the Federal Housing Administration ("FHA"). Five years later, in an amicus brief submitted to the en banc court in this case, the federal government announced for the first time that the covenant at issue must be read to give lenders the discretion to increase the flood insurance requirement at any time. Our colleagues conclude that the government's interpretation retroactively nullifies the bargain allegedly struck by Kolbe and his lender, even though that agreement rested on a reasonable construction of the provision and, importantly, is consistent with federal law.

Our colleagues' judgment constitutes extraordinary intervention into the contractual dealings of two private parties. In effect, they conclude that a federal agency, through court intervention, may rewrite an agreement even though the agency is not a party to the deal, and has no role in its enforcement, simply because a different agreement would better serve the government's newly clarified priorities. There is no justification for such a wholesale abandonment of common law contract principles by our colleagues. Regrettably, the even division of views on the en banc

court means that the decision of the district court dismissing Kolbe's breach of contract and good faith and fair dealing claims against Bank of America will be reinstated.

At bottom, this is a straightforward motion-to-dismiss case. Kolbe asserts that he and his original lender, Taylor, Bean & Whitaker Mortgage Corp. ("Taylor Bean"), agreed that Kolbe was required to maintain only the statutory minimum amount of flood insurance on his property throughout the duration of his mortgage. Taking that factual assertion as true, as we must, Bank of America's demand that Kolbe increase his flood coverage provides the basis for a plausible claim that the Bank committed a breach of contract. Kolbe likewise alleges facts that would permit a jury to find that the Bank made its demand to serve its own financial interests, in violation of the implied covenant of good faith and fair dealing. Whatever the ultimate resolution of his contentions, Kolbe has done enough to defeat the Bank's motion to dismiss and, hence, is entitled to move forward with his case, including discovery.

As we shall explain, denying him that opportunity is indefensible.

**I.**

We will not here reprise the textual analysis of Paragraph 4 of Kolbe's mortgage that appears in the majority panel opinion previously vacated by the en banc court. See App'x. The

discussion there makes plain that the provision is ambiguous, and its lack of clarity is underscored by the lack of consensus in the decisions of other courts. Compare, e.g., Morris v. Wells Fargo Bank N.A., No. 2:11-cv-00474, 2012 WL 3929805, at *7-8 (W.D. Pa. Sept. 7, 2012) (denying motion to dismiss breach of contract claim involving same language) (stating that, "[a]t the very least, plaintiff's interpretation is tenable"), and Wulf v. Bank of Am., 798 F. Supp. 2d 586, 588 (E.D. Pa. 2011) (same), with, e.g., McKenzie v. Wells Fargo Home Mortg., Inc., No. 3:11-cv-04965-JCS, 2012 WL 5372120, at **13-15 (N.D. Cal. Oct. 30, 2012) (adopting reasoning of Kolbe panel dissent). Our colleagues, who acknowledge the "set of sharply conflicting district court opinions" on this issue across the country,[27] nonetheless reject the notion of ambiguity and assert that appellee Bank of America offers "the only plausible reading in the relevant context."

---

[27] Indeed, at the en banc oral argument, one of our opposing colleagues explicitly acknowledged the poor drafting after another member of the court made the following observations:

> It seems self-evident that this was a lousy job of drafting by somebody. You have this court divided, you have courts around the country divided on this. . . . There are five ways in which this provision could have been written to completely avoid this controversy. . . . It seems preposterous to suggest this is plain language.

Government counsel shortly thereafter came to the podium and was told by our colleague:

> [W]e don't need to repeat [the above] characterization of the drafting job on this, but you might want to convey that sentiment when you return to Washington.

The problem is that this conclusion of non-ambiguity is procured by means of hindsight,[28] with substantial weight given to the government's newly announced view and the policies offered to justify it. We do not minimize the importance of the government's interpretation of Paragraph 4. We acknowledge that the additional context revealed in the government's amicus brief sheds helpful light on the meaning that was intended when the covenant was crafted by the Department of Housing and Urban Development in the 1980s. Our disagreement is not with our colleagues' lengthy exegesis on the nature of contract construction as applied to uniform clauses and language drafted by the United States. Rather, those principles are inapplicable to the specific issue before us.[29]

Our colleagues insist that what the government says with clarity in 2013 overrides the meaning that Kolbe and his lender ascribed to Paragraph 4 five years earlier. Yet the government's

---

[28] We repeat the panel majority's reminder that this appeal concerns the grant of a motion to dismiss. Vacating that ruling would not deny the Bank the opportunity to develop a record in support of its position and, if appropriate, to seek summary judgment. Kolbe, however, is entitled to an equivalent opportunity to prove his case.

[29] To the extent the panel majority suggested that the construction of Paragraph 4, a uniform covenant promulgated for all FHA-insured mortgages, is generally a question of fact to be decided by a jury, we disclaim that view. As we shall explain, the question for a factfinder in this case is the nature of the agreement reached by the two contracting parties, i.e., did they agree that the flood insurance requirement would remain at the statutorily required minimum (in this instance, the amount of the outstanding principal balance) for the duration of the mortgage?

effort now to dispel the confusion generated by its poorly drafted language cannot erase the ambiguity that confronted Kolbe and his lender when they signed their mortgage agreement. As the panel majority explained, the textual signals in Paragraph 4 point in both directions, and there is nothing implausible about a federal agency charged with promoting home ownership choosing to adopt Congress's benchmark for flood insurance coverage as a way to balance affordability and risk avoidance.[30] The government's clarification does not magically eliminate the mixed message communicated by the language and structure of Paragraph 4. It therefore does not change the fact that Kolbe and his lender could have agreed that the phrase requiring flood insurance "to the extent required by the Secretary" fixed Kolbe's obligation at the statutory minimum for the duration of the loan.[31]

---

[30] The same balance could plausibly explain Congress's decision to impose the minimum flood insurance requirement only for homes in areas at high risk for flooding ("special flood hazard areas") and not for those facing only a moderate, lesser, risk.

[31] Our colleagues suggest that Kolbe's construction of Paragraph 4 cannot be correct because, inter alia, it conflicts with the language of Covenant 7, another standard HUD paragraph. Covenant 7 allows the lender to "do and pay whatever is necessary to protect the value of the Property," including payment of taxes and hazard insurance, and the lender is authorized to charge the borrower for any disbursements made for such purposes. The proffered inconsistency is that the lender is authorized by Covenant 7 to protect the property's "value" and not only "the Lender's rights in the Property" -- arguably suggesting that the lender has an interest in flood insurance beyond the amount of the outstanding principal balance.

Covenant 7, however, does not undermine Kolbe's interpretation of the flood insurance requirement. The need to protect the

Hence, the pivotal issue -- the one that sharply separates our view from that of our colleagues -- is not whether the text of Paragraph 4 is ambiguous, but whether the government's belated clarification should be decisive in this case. Our colleagues answer that question in the affirmative. In other words, even if they conceded the covenant's ambiguity, they would still refuse to allow Kolbe's lawsuit to proceed. They maintain that the government's newly offered construction of Paragraph 4 not only governs mortgage agreements entered into subsequent to the pronouncement, see Auer v. Robbins, 519 U.S. 452, 457-58 (1997) (holding that agency's interpretation of its own regulations is owed deference), but also operates retroactively to supersede the shared understanding of private parties who previously entered into mortgages containing the flawed language. Accordingly, ambiguity aside, they conclude that the district court properly dismissed Kolbe's complaint alleging that Bank of America, the successor-in-interest to Taylor Bean, improperly forced Kolbe to purchase additional flood insurance.

---

"value" of the property would be triggered whether the borrower failed to secure flood insurance at the statutory minimum or in some greater amount. Covenant 7's purpose is to authorize the lender to act if the borrower defaults, i.e., if the borrower "fails to perform any . . . covenants and agreements contained in [the] Security Instrument." The scope of the authority to act depends on the nature of the default. The critical issue thus remains the amount of flood insurance the lender may require under Paragraph 4.

Our colleagues identify three separate strands of reasoning to support their conclusion, all of which essentially reduce to the same proposition: the government's explanation of uniform contract terms that it promulgated trumps any other shared understanding of those terms by private contracting parties. Whatever the force of that principle in other circumstances, we strongly disagree that the government may reach back in time to override lawful agreements between two private parties who shared the same understanding of their mutual commitment. Cf. Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2168 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance . . . ."). Federal law does not demand such a result, and our responsibility to respect private contracts should preclude such a substantial departure from legal norms.

## II.

Even under the Bank's and government's view of Paragraph 4, lenders may exercise their discretion to do what Kolbe maintains that Taylor Bean did here: issue a HUD-insured home loan contingent on the borrower's maintaining flood insurance throughout the mortgage period in an amount equal to the loan's outstanding principal balance, i.e., at the statutory minimum for loans less

than $250,000.[32]   This is so because Paragraph 4 does not bar lenders from committing to a specific amount of required coverage for the duration of the mortgage.  The pertinent sentence in the uniform covenant states only that the hazard insurance required by the lender "shall be maintained in the amounts and for the periods that Lender requires."  The lender could thus choose the statutory minimum as its required "amount[]" for the entire "period[]" of the loan.

The conflict in this case arises from the fact that, under the construction of Paragraph 4 advanced by Kolbe, specifying the amount and period was unnecessary because the uniform covenant itself capped the flood insurance requirement at the statutory minimum, while under the Bank's construction, the covenant allows the lender to change the amount at any time.  We presume that our colleagues would reach a different conclusion if Kolbe and Taylor Bean had signed a supplemental document setting the minimum amount of insurance as the amount required for the entire loan period.  In that case, the lender would have expressly exercised the discretion to which the Bank claims entitlement by choosing an amount of coverage that Congress, in the National Flood Insurance Act, deemed adequate.  Our colleagues nonetheless contend that federal policy

---

[32] Flood coverage for a residential property securing a mortgage issued by a federally regulated lender must be in an amount at least equal to the outstanding principal balance of the loan, or $250,000, whichever is less.   See 42 U.S.C. §§ 4012a(b)(1), 4013(b)(2); 24 C.F.R. § 203.16a; 44 C.F.R. § 61.6.

bars us from enforcing an agreement containing those terms -- based on the parties' joint understanding of Paragraph 4, rather than on a separate written document -- against Taylor Bean's successor-in-interest, Bank of America. We elaborate below on why we believe our colleagues are wrong.

## A. Integrity of Contracts

If we applied ordinary contract principles to this case, the ambiguity in Paragraph 4 would foreclose dismissal of the complaint because Kolbe would be entitled to show that his understanding of the provision reflects the actual intention of the contracting parties. The New Jersey Supreme Court "permit[s] a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties," Conway v. 287 Corporate Ctr. Assocs., 901 A.2d 341, 347 (N.J. 2006), and we could not achieve that goal here without giving Kolbe the opportunity to develop the facts in support of his claim that Taylor Bean understood Paragraph 4 as he did.[33] The New Jersey high court has described the court's contract-interpretation role as follows:

---

[33] Although the meaning of Paragraph 4 is a question of federal law, we use New Jersey's general framework for contract interpretation. The mortgage itself provides that it is governed by "federal law and the law of the jurisdiction in which the Property is located." App. at 34, ¶ 14. Cf. LPP Mortg., Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009) (noting that, even where "federal common law governs as to contractual issues," courts typically borrow from state law and apply ordinary contract principles).

> In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose.

Tessmar v. Grosner, 128 A.2d 467, 471 (N.J. 1957); see also, e.g., Pacifico v. Pacifico, 920 A.2d 73, 77 (N.J. 2007) ("[I]t is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties.").

If, as Kolbe maintains, the evidence demonstrated that both he and Taylor Bean understood Paragraph 4 to cap his flood insurance obligation at the amount "required by the Secretary" -- i.e., at the statutory minimum -- application of traditional contract law principles would end the matter. Where there is no dispute between the contracting parties about which of two reasonable interpretations of their agreement is correct, the parties' shared understanding surely would govern -- barring some collateral reason to depart from ordinary principles. See Conway, 901 A.2d at 347 ("'The polestar of construction is the intention of the parties to the contract . . . .'" (quoting Atl. N. Airlines v. Schwimmer, 96 A.2d 652, 656 (1953))). The Bank, as Taylor Bean's successor-in-interest, would stand in the original lender's shoes, and would be bound by that shared understanding.

The Bank and our colleagues assert that this is an instance where ordinary contract principles do not apply because the language under scrutiny derives from a government source and must be interpreted uniformly in every instance. The Bank cites federal and New Jersey case law to support its contention that the government's construction of government-generated contractual language, whether derived directly from a statute or drafted by an agency to carry out its regulatory mission, prevails even over the mutually agreed upon understanding of the parties. The Bank, in other words, asserts that the government's wishes about how the parties should have understood the ambiguous language override the parties' actual understanding of the language.

In so arguing, the Bank (and our colleagues) inexplicably treat this case as indistinguishable from the cases on which they rely to establish the principle of uniformity. From multiple perspectives, however, this case is unlike that precedent. Most significantly, each of the decisions highlighted by the Bank involved a dispute between the contracting parties about the meaning of language in their agreement. See Ill. Steel Co. v. Balt. & Ohio R.R. Co., 320 U.S. 508, 508-509 (1944); Honeywell Inc. v. United States, 661 F.2d 182, 185-86 (Ct. Cl. 1981); Paul Revere Life Ins. Co. v. Haas, 644 A.2d 1098, 1103 (N.J. 1994). Hence, some principle of contract interpretation was necessary to resolve the conflict. When such a dispute is between parties of unequal

-60-

bargaining power, the stalemate is usually resolved by adopting the meaning most favorable to the non-drafting party, a method of interpretation known as contra proferentem. See Pacifico, 920 A.2d at 78. That principle also operates in specific contexts. See, e.g., Kieffer v. Best Buy, 14 A.3d 737, 743 (N.J. 2011) (stating that ambiguity in an indemnity provision is construed against the indemnitee); Marcinczyk v. N.J. Police Training Comm'n, 5 A.3d 785, 789 (N.J. 2010) (stating that ambiguity in exculpatory contracts "must be resolved against the drafter of the agreement" (quoting Gershon v. Regency Dining Ctr., Inc., 845 A.2d 720, 726 (N.J. App. Div. 2004))); Simonetti v. Selective Ins. Co., 859 A.2d 694, 698 (N.J. Super. Ct. App. Div. 2004) (stating that ambiguity in an insurance contract "must be resolved against the insurer"). Similarly, when government-generated language is ambiguous in a dispute between contracting parties, courts are inclined to defer to the government's interpretation of its own language. See, e.g., US Bank, N.A. v. Hough, 42 A.3d 870, 877 (N.J. 2012) (noting that "we defer to an agency's interpretation of . . . [a] regulation, within the sphere of [its] authority, unless the interpretation is 'plainly unreasonable'" (alterations in original) (internal quotation marks omitted)).

But given the paramount importance of the parties' intentions in resolving contract disputes, it is a considerably more dramatic departure from basic contract law to accept the

government's interpretation of ambiguous language as decisive where both parties to a private contract manifested a contrary, consistent understanding of the language. The allegations in Kolbe's complaint permit a finding that such an understanding existed. See, e.g., Marcinczyk, 5 A.3d at 788-89 ("[P]arties bargaining at arms-length may generally contract as they wish, subject only to traditional defenses such as fraud, duress, illegality or mistake." (citations omitted)). So long as the parties' agreement does not violate important policy objectives, we cannot accept that the government's interpretive authority may intrude so deeply into private contractual agreements. Cf. Shaw v. City of Jersey City, 811 A.2d 404, 411 (N.J. 2002) (adopting construction of statute that is "consistent with both legislative design and the reasonable expectations of [the insured]" (emphasis added)). As we discuss in the next section, Kolbe's construction of Paragraph 4 of his mortgage agreement does not conflict with the policies embodied in the National Flood Insurance Act.

The private nature of Kolbe's mortgage agreement also distinguishes this case from some of those cited by the Bank and our colleagues. In Honeywell, which arose in the unique context of military contracts, the United States was one of the parties and the language interpreted was purely regulatory, and not incorporated into a contract. See 661 F.2d at 184 (noting dispute concerning Armed Services Procurement Regulation 15-205.34). The

decision resulted from the appeal of a ruling by the Armed Services Board of Contract Appeals -- a far cry from this private contract action. Similarly, in Saavedra v. Donovan, 700 F.2d 496, 499-500 (9th Cir. 1983), cited by our colleagues, the court rejected a government contractor's claim in an enforcement proceeding that his failure to pay government-required fringe benefits was attributable to ambiguous language in the contracts.[34] The decision in Lloyd v. Cincinnati Checker Cab Co., 36 N.E.2d 67 (Ohio Ct. App. 1941), also cited by our colleagues, is similarly inapt. The defendant there had sought to set off an insurance claim against a statutory assessment it owed because its insurer (a mutual assessment company) had been liquidated and taken over by the Ohio Superintendent of Insurance. The court held that the assessment was a non-contractual obligation of the defendant owed to the state as trustee for the insurer's creditors and was thus "not a contractual liability involving a meeting of the minds." Id. at 69 ("The debt of the defendant herein involved is a debt created by force of statute, not a debt created by any voluntary act of the parties.").

Our colleagues also rely on Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039 (2d Cir. 1982), for the proposition that "uniform contracts are interpreted uniformly

---

[34] It is also significant that Saavedra is another instance where the contracting parties did not share a common understanding of their agreement.

across cases whenever it is reasonable to do so." This principle, they say, means that "extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant." However, the context of Sharon Steel, which involved the debt securities market, was markedly different from this personal mortgage dispute. The case concerned boilerplate language in "successor obligor clauses" in debenture indentures, and the Second Circuit emphasized that "uniformity in interpretation is important to the efficiency of capital markets." Id. at 1048. Kolbe's and his lender's allegedly common understanding of his personal loan has no equivalent implications.

Indeed, the very cases that gave birth to the interpretive principles that the Bank and our colleagues invoke also involve contexts far removed from the mortgage relationship of Kolbe and Taylor Bean. In Auer, the plaintiffs were officers of the St. Louis Police Department who brought suit against the city's Board of Police Commissioners seeking overtime pay they claimed was owed under a provision of the Fair Labor Standards Act. See 519 U.S. at 455. The Board argued that the officers were not entitled to such pay based on a statutory exemption. See id. The Supreme Court deferred to the Secretary of Labor's interpretation of applicable regulations, which was provided in an amicus brief requested by the Court. Unlike here, there was no contract provision in dispute that was reasonably subject to a common

-64-

understanding by the contracting parties. The circumstances in Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945), noted by our colleagues as the origin of the concept of Auer deference, are even more distant from the breach-of-contract case before us. The dispute there was between a government official -- the Administrator of the Office of Price Administration -- and a manufacturer of crushed stone that was subject to a maximum price regulation. In determining the permissible price the manufacturer could charge pursuant to the regulation, the Court stated that it "must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." Id. at 414.

It is also noteworthy that, in all three of the cases cited by the Bank, the courts concluded that the disputed language was not ambiguous. In Haas, which involved an insurance dispute, the New Jersey Supreme Court disagreed that "an ordinary insured" would read the policy as the plaintiff contended. 644 A.2d at 1107. In Honeywell, the court stated that "the language and purpose of the regulation is plain." 661 F.2d at 186. In Illinois Steel, the Supreme Court concluded that "the reasonable construction" of a clause in a uniform bill of lading approved by the Interstate Commerce Commission was the one urged by the petitioner. 320 U.S. at 515.

It is a broad leap from these precedents to say that the government, through the intervention of the courts, may invalidate the contracting parties' joint adoption of one of two reasonable constructions of their private contractual relationship. We reiterate that we are <u>not</u> saying that the meaning of the FHA's uniform covenants is a question of fact to be resolved by a jury. We agree with our colleagues that, as a general proposition, "[w]hen dealing with uniform contract language imposed by the United States, it is the meaning of the United States that controls." We further agree that that meaning is determined as a matter of law by the court. The issue here, however, is not the meaning of the provision in the abstract. Where one of the contracting parties supportably alleges that both signatories reasonably understood the provision differently from the government, and where that alleged understanding does not conflict with the pertinent federal scheme, the plaintiff is entitled to a factfinder's determination on whether there was a contractual breach. Briefly stated, there is no justification for interfering with basic contract law principles where the contracting parties' meeting of the minds is consistent with federal policy.

Of course, it may be difficult for a mortgage holder to prove that he and his lender had a common understanding of a government-promulgated uniform provision that differs from the government's interpretation. As our colleagues point out, it is

not enough in this case that Taylor Bean did not increase Kolbe's flood insurance requirement during the time that it held the mortgage. That stability may reflect only the lender's choice at the time, not a commitment for constancy throughout the loan period. Notwithstanding the difficulties, however, Kolbe is entitled to move forward with his contract claim because, as we now explain, allowing it would not contravene federal policy.

## B. Federal Policy

We do not doubt that, more often than not, it would be advisable for borrowers to obtain more than the minimum amount of flood insurance. Such coverage is not, however, what federal law requires. The mandate from Congress is that lenders ensure coverage in an amount at least "equal to the outstanding principal balance of the loan," up to $250,000. 42 U.S.C. § 4012a(b)(1). Our colleagues' policy concerns, therefore, cannot be directed toward a lender's decision to impose the minimum amount of flood insurance prescribed by statute -- which explicitly is allowed -- but necessarily must question the lender's exercise of discretion to give up the right to increase that amount during the life of the loan.

Neither the Bank nor the United States has demonstrated that federal law would be offended by such arrangements. The National Flood Insurance Act was designed, in part, to reduce the heavy cost to the federal government for disaster relief, and the

-67-

resulting federal scheme thus placed on lenders the duty to ensure that flood insurance is obtained for properties purchased through HUD-guaranteed mortgages. In its brief, the government points out that HUD enforces that duty, inter alia, by withholding payment on mortgage-insurance claims filed by lenders until the damage from floods (as well as fire, hurricane and tornado) has been repaired. See 24 C.F.R. § 203.379(a), (c). According to the United States, "[t]his rule, by design, creates a strong incentive for the lender to ensure that the borrower maintains sufficient insurance to cover any form of hazard-related damage that may arise."

The rule does not tell lenders they must secure more than the minimum amount of flood protection, however, or that they may not agree to a fixed amount. The decision on how much to require, and when, is left up to individual lenders. Indeed, the government explicitly tells us that "HUD has organized its mortgage insurance program on the premise that lenders can and should make [the] determinations" on the "appropriate amount of flood insurance necessary to protect their investments." Brief, at 2. Thus, even accepting the government's construction of Paragraph 4, lenders are not foreclosed from making commitments that the government, operating with different priorities from banks and mortgage companies, may see as against the lenders' self-interest. Dismissing Kolbe's complaint is to ignore the possibility that

Taylor Bean made a permissible choice different from the one the government expected.[35]

Taylor Bean, of course, is no longer in the picture, and Bank of America now bears the burden of agreements made by its predecessor. The change in lenders should not compromise Kolbe's contractual arrangement with Taylor Bean. Although the government could choose to adopt a regulation barring lenders from binding possible successors-in-interest to a fixed flood-insurance requirement at the statutory minimum, it has not done so by means of Paragraph 4.

The government also claims that, "[i]f Kolbe's interpretation were to prevail, it is not difficult to foresee that lenders would simply decline to offer FHA-insured loans in areas facing even marginal flood risks, or charge substantially greater interest rates for such loans." But that prediction is of no relevance to the evaluation of Kolbe's breach-of-contract claim. The issue before us is not future conduct, but the understanding of two parties who entered into a mortgage agreement before the government clarified Paragraph 4's ambiguous language. Prospectively, borrowers and lenders are on notice that Paragraph

---

[35] Kolbe's theory is that Taylor Bean did not, in fact, make a choice because both he and the lender understood Paragraph 4 to set a ceiling on the flood insurance requirement. The pertinent point here is that, even under the Bank's interpretation, federal law permitted Taylor Bean to impose that requirement for the entire loan period. Hence, Kolbe's interpretation is not inconsistent with federal policy.

4, as interpreted by the government, affords lenders the right to increase their borrowers' flood insurance requirement at any time, at the lenders' discretion.  Kolbe reasonably maintains that Paragraph 4 meant something different to him and Taylor Bean.

Moreover, the prediction that lenders would start charging higher interest rates or abandon FHA mortgages on properties at risk for flooding is entirely speculative and not borne out by the available facts.  There is no evidence that lenders have routinely required more than the statutorily prescribed minimum amount of flood insurance.[36]  Indeed, Kolbe has pointed to evidence indicating that they routinely have not made such a demand.  For all we know, lenders may be promising a fixed, minimum flood insurance obligation as a way to sell themselves over competitors.  On the other hand, if lenders have routinely read Paragraph 4 as Kolbe does, and have only reluctantly made commitments consistent with that understanding, the government can take steps to clarify its intentions by promulgating revised, or additional, regulations.

Although our colleagues appear to fear that allowing Kolbe's lawsuit to proceed would trigger a catastrophe in light of "the nearly 7.8 million FHA-insured mortgages nationwide," we fail

---

[36] We note that, to the extent the absence of such evidence reflects the lenders' understanding that Paragraph 4 bars them from demanding more than the minimum amount of insurance, Kolbe's ambiguity argument is strengthened.

to see how Kolbe's claim would significantly change the balance of risks nationwide among individual homeowners, lenders, and the government.  As noted above, the system tolerates lenders limiting their borrowers' flood insurance obligation to the amount "required by the Secretary," as that practice has been followed by at least some number of mortgage providers.  In addition, it is a fair assumption that many homeowners -- like Kolbe -- already maintain flood insurance in excess of their outstanding loan balances, and -- to the extent that they are financially able -- more homeowners can be expected to increase their coverage in the face of the recent major flooding highlighted by our colleagues.  Certainly, lenders may urge their borrowers to fully protect their equity, and it defies commonsense to presume that most homeowners will act against their own best interests.  In any event, homeowners and lenders will be protected from the most drastic outcome, as the required insurance coverage will take care of the outstanding mortgage debt (up to $250,000).  See 42 U.S.C. § 4013(b)(2).

In sum, HUD allows the lender to set the statutory minimum (i.e., the amount of the outstanding principal balance or $250,000, whichever is less) as the required amount of flood insurance for the entire duration of a mortgage.  Because Paragraph 4 of Kolbe's mortgage agreement reasonably may be read to say that no greater amount will be demanded of him, Kolbe should be allowed to demonstrate that he and Taylor Bean in fact shared such an

understanding of their accord and that, consequently, Bank of America's threat of force-placed insurance was a breach of his mortgage contract.

## III.

In the opposing opinion authored by Judge Kayatta, our colleagues cast our approach to this case as a threat to breach-of-contract class actions and as contrary to the principles applicable to government-mandated, standard contract provisions. We address below why our colleagues' hypothesized concern about contract-based class actions is misguided. As for the supposed conflict with the rules governing standard provisions, our discussion above demonstrates why those principles are inapt in a context where <u>both</u> contracting parties may have had the same understanding of the pertinent, <u>ambiguous</u> language. Contrary to our colleagues' assumption, we do not know at this point in the litigation whether any such understandings were stated or unstated or, indeed, whether Kolbe and Taylor Bean construed Paragraph 4 the same way. Ascertaining those facts is the purpose of the discovery that our colleagues prevent Kolbe from undertaking.

Although we have chosen to rely primarily on the original panel decision on the issue of ambiguity, we add a few observations prompted by Judge Kayatta's opinion before turning to the class action discussion.

## A. Ambiguity

In finding the language of Paragraph 4 unambiguous, our colleagues point to passing references in HUD materials as evidence that Kolbe (and Taylor Bean) could not have reasonably construed the language as Kolbe proposes.  A "reasonable" consumer, however, could not have been expected to unearth and rely on such indirect, scant references.  Although <u>FEMA</u>, by contrast, explicitly recommends that lenders require replacement cost insurance -- a fact deemed "[q]uite significant[]" by our colleagues -- that recommendation is unsurprising given FEMA's emergency response role.  No matter how clear FEMA's recommendation, FEMA's view cannot eliminate the ambiguity in Paragraph 4, which originated with a different agency -- the FHA -- charged with a different primary mission -- to promote affordable home ownership.  In addition, the rejection of ambiguity at the motion-to-dismiss stage cannot turn on whether one construction reflects the <u>best</u> policy as determined by current government officials; the question before us is whether the language is reasonably susceptible to both interpretations.  On its face, Paragraph 4 is ambiguous, and, as the panel majority explained, the extrinsic clues that were available when Kolbe signed his mortgage agreement did not eliminate the ambiguity.

## B. Class Actions

Our colleagues claim that we have gone beyond the literal text of Kolbe's complaint in an "overly creative manner" and, in doing so, have "run[] the risk of materially harming the interests of consumers in a broad variety of actions." This criticism misfires on multiple levels.

### 1. Beyond the Complaint

Our colleagues disregard the progression of Kolbe's action beyond its original filing. Although his complaint was drafted from the perspective that Paragraph 4 unambiguously limits the flood insurance obligation to the statutory requirement -- and, hence, has only one reasonable meaning -- his response to the Bank's motion to dismiss introduced the alternative argument that the motion also must be denied if the court found the paragraph to be ambiguous. See Pl.'s Opp. to Defs.' Motion to Dismiss (filed May 9, 2011) ("Plaintiff's Opposition"), at 13.[37] Nothing in

---

[37] Kolbe's Opposition stated, in part:

Plaintiff respectfully submits for all of the reasons discussed above, that the Court should conclude that paragraph four of the Mortgage unambiguously provides that Plaintiff was not obligated to maintain more flood insurance coverage on his Property than the outstanding balance of his loan and hence the Defendants' motion to dismiss should be denied.

Plaintiff acknowledges, however, that the Court could conclude, as did the Magistrate Judge in Wulf, that some of the provisions of the Mortgage at issue are ambiguous. Of course, if the Court reached that

Kolbe's complaint foreclosed such an evolution of his argument, and the narrowing of a complaint's scope to support an alternative litigating position is hardly unusual. <u>Cf.</u>, <u>e.g.</u>, <u>Rodríquez-Suris</u> v. <u>Montesinos</u>, 123 F.3d 10, 20 (1st Cir. 1997) (citing <u>McCalden</u> v. <u>Calif. Library Ass'n</u>, 955 F.2d 1214 (9th Cir. 1990), for the proposition that "allegations should not be construed as an admission against inconsistent claims"); Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Both the district court and the original panel accepted this alternative view of Kolbe's contentions. The district court expressly addressed the argument, albeit rejecting it:

> The Court also concludes that the three relevant sentences are not ambiguous and do not create a conflict. . . . The Court finds that plaintiff's proposed interpretation of his mortgage is unreasonable and that the mortgage contract, especially in light of the NFIA language, is eminently clear. Therefore, the contract is not ambiguous.

---

conclusion the Defendant's Motion to Dismiss would still have to be denied. <u>See, e.g.</u>, <u>Aware, Inc. v. Centillium Commc'ns, Inc.</u>, 604 F. Supp. 2d 306, 310 (D. Mass. 2009) ("If the language of a contract is ambiguous a motion to dismiss must be denied."). <u>See also</u> <u>Curtis v. Treloar</u>, No. 96-1239, 1998 WL 1110448, at *4 (D.N.J. Aug. 27, 1998) ("If we determine that the contract is ambiguous, then we must deny defendants' motion for summary judgment, as the interpretation of an ambiguous term in a contract is generally a question of fact.").

Kolbe then went on to argue that any ambiguity in the contract must be construed against the defendants. <u>See</u> Plaintiff's Opposition at 13-15.

The panel majority on appeal focused on ambiguity, concluding that "the mortgage is reasonably susceptible to an understanding that supports Kolbe's breach of contract and implied covenant claims."

In addition, at the en banc oral argument, Kolbe's counsel emphasized the need to ascertain Kolbe's and Taylor Bean's intent at the time they entered into the mortgage contract. Among other statements, Kolbe's counsel asserted that "[t]he government's position does not control what the parties' intent was. The ultimate issue in any breach of contract case is what was the intent of the parties when they entered into the contract." Although this statement on its own is overly broad in the context of government-promulgated uniform provisions, it nonetheless reflects Kolbe's consistent backup argument that Paragraph 4's ambiguity requires fact-finding on the parties' understanding of the language. Confining Kolbe to his literal allegations would thus unfairly ignore the actual case history.

Our colleagues further suggest that we should not expand Kolbe's allegations beyond the literal words of his complaint because that pleading was carefully crafted to promote class certification. But the class that Kolbe and his counsel originally contemplated -- all FHA borrowers from whom Bank of America had demanded an amount of flood insurance in excess of the principal balance -- appears to be no longer viable. The government's intervention means that Paragraph 4 ordinarily must be read to

permit lenders to demand flood coverage up to the property's replacement value. Under Kolbe's backup theory of ambiguity, however, his claims do survive for a smaller class of aggrieved borrowers -- those whose original lenders understood and implemented Paragraph 4 consistently with Kolbe's proposed construction. By invoking ambiguity, Kolbe himself, and not the authors of this opinion, promoted this narrower version of his breach-of-contract claim. Our colleagues are wrong to deny Kolbe his choice of a viable litigation strategy.

To be sure, the need to inquire into the lender's understanding may impact when, or if, Kolbe will be able to obtain class certification. A more limited class also may impact whether Kolbe's counsel -- or any other plaintiff -- will be interested in proceeding with the case. Such consequences, however, are not properly our concern. We should not be deciding whether the case is worth the investment. We decide only whether <u>Kolbe</u> has stated claims against Bank of America. If he has, it will be up to him to choose whether to proceed even if he is unable to represent a class. As the case now stands, Kolbe has proffered a reasonable construction of Paragraph 4 that is consistent with his claims and, hence, the district court should have denied the Bank's motion to dismiss.

## 2. Future Class Actions

Our colleagues appear to take the position that allowing Kolbe's case to move forward will compromise the entire universe of possible class actions involving contracts. They warn that counsel for consumers "in a broad variety of actions" would have difficulty drafting pleadings that could survive defense opposition to class certification because defendants would invoke the possibility of "subjective and unspoken understandings that could vary from [person to person]." At a minimum, they suggest that our approach would delay class status rulings "until after extensive discovery."

These warnings exaggerate the risk and devalue Kolbe's individual interest in obtaining a remedy for allegedly improper and unfair treatment. This is an unusual contract case in that the defendant, an outsider to the original agreement, argues that it does not matter how the original parties understood their deal. The case is therefore an ill-suited exemplar for generalizations about contract-based class actions. In the ordinary contract case, where the signatories to an agreement dispute the meaning of a standard provision, an interpretive principle will likely be used to resolve the case. Section 211 of the Restatement, cited by our colleagues, is one such principle.[38] But in the rare instance where

---

[38] Our colleagues' "Tom Sawyer" characterization of our view of section 211 is puzzling; we consider the principles it embodies important and necessary when the original contracting parties dispute the substance of their agreement.

both parties reasonably understood the ambiguous language the same way (consistently with government policies), such interpretive principles are unnecessary. Under basic contract law, the parties' meeting of the minds is decisive.[39]

Any precedent set in this case would thus have limited reach. Indeed, contract claims as a general category -- as opposed to statutory or tort claims -- may be more difficult to bring as class actions precisely because their foundation is the parties' understanding. Without question, claims such as those Kolbe originally sought to bring, based on assertedly unambiguous standard language favoring the plaintiffs, are ideal from a potential class action perspective. But when a court agrees that the challenged language is unambiguous, this case will be irrelevant and have no impact. On the other hand, where the language is found ambiguous, and plaintiffs can prove that they and their contractual partner held the same reasonable (and consistent with policy) understanding, the principles we have outlined give

_____

[39] In disputing the limited impact of our approach, our colleagues observe that it is "anything but 'rare' for a plaintiff in a contract case to argue that the other party to the contract could be found to have shared her subjective understanding." The scenario to which we refer does not arise, however, every time a plaintiff claims that the parties understood their agreement the same way. Rather, we deem section 211 inapplicable in the context of uniform provisions only where a breach-of-contract claim rests on language determined by a court to be ambiguous and the plaintiff's allegation of a shared interpretation is not disputed by the other contracting party -- such as where, as here, the other party is not a defendant in the action. Those are not typical circumstances.

them the right to proceed. Inexplicably, our colleagues think it is more favorable to plaintiffs for Kolbe to be allowed no claim at all.

As our colleagues point out, looking to the contracting parties' understandings to resolve ambiguity may delay decisions on class certification until after discovery has taken place. Such timing is not unusual. Courts must engage in "'rigorous analysis'" to determine if the requirements of Federal Rule of Civil Procedure 23 have been met. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)). That analysis "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim," id., and thus require the presentation of evidence, see, e.g., id. at 2549 (listing three types of evidence offered to show presence of common issues among all plaintiffs). The resulting delay is not always bad. See Alba Conte, Herbert Newberg & William B. Rubenstein, 3 Newberg on Class Actions §§ 7:2, 7:3 (4th ed. 2013) (noting the potential advantages and disadvantages of early class certification for both plaintiffs and defendants). Our colleagues' concern about widespread future prejudice to contract-based class actions is thus overstated.

The battle between the parties at this point is plainly about Kolbe's right to discovery and the Bank's desire to avoid any inquiry into its practices, which Kolbe challenges as motivated by

bad-faith profit-seeking.  See Robert H. Klonoff, <u>Class Actions and</u> <u>Other Multi-Party Litigation in a Nutshell</u> 146 (4th ed. 2012) ("Aggressive, thorough discovery is frequently decisive in class certification battles."); <u>id.</u> at 147 ("In most instances, courts will not grant or deny class certification without discovery."). Even if this case turns out to be an individual action, Kolbe is entitled to discovery.  We certainly have no authority to terminate a lawsuit that may turn out to be well-grounded on the merits based on the rationale, as articulated by our colleagues, that it is "without practical worth or purpose."

## IV.

In sum, there is neither a legal nor -- as our colleagues assert -- "pragmatically progressive" justification for dismissing Kolbe's lawsuit at this early stage of the case.  Indeed, it is a considerable injustice to do so.  Our colleagues abandon basic contract law principles.  They ignore the government's sloppy drafting of Paragraph 4 and say that it does not matter that <u>both</u> signatories to the mortgage agreement may have reasonably understood the provision as Kolbe alleges he did.  We do not minimize the importance of section 211 as a mechanism for dispute resolution.  A rule specific to uniform provisions makes sense where contracting parties disagree about the meaning of their accord.  But where the language is ambiguous, the parties construe it the same way, and their interpretation does not conflict with

federal policy, it does violence to traditional contract law precepts to allow the government's explanation of its murky language to override the parties' meeting of the minds. Not surprisingly, the caselaw relied upon by the Bank and our colleagues does not speak to these circumstances.

By allowing the district court's dismissal of this case to stand, our colleagues have, in effect, upended basic contract law to advantage a massive financial institution over individual homeowners whose circumstances necessitated resort to government-insured financing. Kolbe and others like him may have sought a fixed flood-insurance obligation to help offset the many unpredictable costs of homeownership. Some of them are now facing demands for increased coverage after more than a decade of fixed coverage, with possibly dire consequences for their economic security. Cf. Lass v. Bank of Am., N.A., 695 F.3d 129, 132 (1st Cir. 2012) (involving a similar demand, though based on different contract language, for approximately $145,000 in additional coverage fifteen years after mortgage was obtained). It should be unthinkable that Bank of America may rewrite agreements -- which were consistent with a reasonable construction of Paragraph 4 and federal law -- at the expense of such homeowners.

Thus, the district court's unwarranted dismissal of this case should be vacated, and the action remanded for further proceedings on both of Kolbe's claims.

**KAYATTA, Circuit Judge, with whom LYNCH, Chief Judge, and HOWARD, Circuit Judge, join.** My disagreement with the conclusion reached by three of my respected colleagues that the contract language is ambiguous even in context is not what prompts me to write this separate opinion. Judges frequently disagree about such matters, and Chief Judge Lynch's opinion well explains why a careful reading of Covenant 4 in context precludes a finding that the covenant can reasonably be read as Kolbe claims. Rather, I write to highlight three other points. First, the opposing opinion authored by Judge Lipez relies on a theory of the facts that is unsupported by the allegations in the only complaint that is before us, and was not even argued below by Kolbe. Second, in its reliance on unstated subjective "understandings" of the parties as a basis for rejecting what it concedes is otherwise the proper uniform meaning of Covenant 4, the opposing opinion directly rejects the wiser, consensus approach manifest in section 211 of the Restatement (Second) of Contracts. Third, the cumulative impact of the approach taken by the opposing opinion would, on the margins, harm consumers who, unlike Kolbe, are the victims of a breach of a standard contract term.

I.

The opposing opinion urges reversal by relying on what it calls a "back-up" theory of the case: If the writing is indeed ambiguous, then perhaps recourse to extrinsic evidence in the form

of the parties' subjective understandings will resolve that ambiguity by showing that both parties understood the writing in the same manner.

The initial problem with this theory is that it does not fit the complaint. The only complaint before the court alleges that the "contract that governs the rights and obligations of the parties" is the "Mortgage Agreement," a written document attached to the complaint as Exhibit 1. Compl. ¶ 17. The complaint quotes language of the written agreement, id. ¶ 22, and cites federal regulations, id. ¶ 23, to advance a single assertion: "pursuant to the . . . quoted provision of the Mortgage Agreement and the applicable FHA regulations Plaintiff was to maintain flood insurance coverage for the Property in an amount equal to the [lesser of $250,000 or the outstanding loan balance]." Id. ¶ 25. The complaint concludes that, by demanding more flood insurance coverage, BAC breached the "mortgage agreements" of Kolbe and others. There is no allegation of any subjective understandings concerning Covenant 4, shared or otherwise. Nor does Kolbe even claim to be one of those unusual consumers who actually read through all of the printed documents for a home loan closing, forming understandings based on the types of nuanced textual analysis often on display in appellate litigation.

To make certain that no one would read the pleadings as suggesting that resolution of the case need turn on any examination

of individual understandings, the complaint also alleges affirmatively that Kolbe is "typical" of "all other persons . . . who are or were obligors on loans that are or were owned or serviced by defendant BAC Home Loans . . . whose mortgage agreements required flood insurance in an amount that was related to the amount of the outstanding balance of the loan. . . ." Compl. ¶ 35. Those other persons of whom Kolbe assures us he is typical include those who did not even deal with his lender, Taylor Bean. In this manner, putative class counsel put together a pleading that simply cannot be read as seeking to enforce a subjective understanding coincidentally idiomatic largely to Kolbe and Taylor Bean, and perhaps a few other borrowers who, like entangled particles, arrived at similar subjective understanding through some uncertain mechanism. Instead, this is a complaint that demands the uniform, class-wide enforcement of a standard written covenant that neither party drafted nor, as far as the complaint alleges, even read.

The limited span of the pleading is underscored by the fact that Kolbe has never advanced the argument on which the entire opposing opinion now rests. He did argue that he should prevail even if the writing were ambiguous. Such an argument is implicitly included (unless disavowed) in most breach of contract complaints. In exercising his right to make this argument, however, he carefully stayed away from arguing that the court should consider

the extrinsic evidence of Kolbe's own subjective understanding to resolve the ambiguity. Rather, he urged that any ambiguity be resolved by a common rule of construction, and that the court not consider extrinsic evidence. Wrote his counsel: "courts should not consider extrinsic evidence in the case of an ambiguous adhesion contract because such contracts should be construed strictly against the drafter." Plaintiff's Oppos. to Motion to Dismiss at 13-14. And the only "back-up" position he stated was that if a court did look at any extrinsic evidence, "the only such evidence applicable here would be the 'conduct of the parties,' which here is limited to the undisputed fact that at the time the mortgage was entered into, Taylor Bean did not require the Plaintiff to maintain flood insurance in excess of the balance of his loan." Id. at 15, n.18.

I understand the concern of my respected and thoughtful colleagues that we not demand undue precision at the pleading stage of a lawsuit. Here, though, we have a complaint conspicuously avoiding any hint that Kolbe had any subjective understanding material to this case. And we have counsel waving "stop" signs insisting that the district court not contemplate the possibility that any such extrinsic evidence should be relied on here. I think it eminently fair to follow that direction.

Even were we to find the opposing opinion's back-up theory to have been pleaded and preserved, that theory would fail because it relies on a supposed "understanding" shared by Kolbe and Taylor Bean that conflicts with what the opposing opinion must concede is the otherwise proper uniform interpretation of Covenant 4. When private parties sign a contract containing a covenant expressly labeled as uniform and mandated by the government, they agree to be bound by the uniform meaning to be given by a court to that covenant based on the government's interpretation, at least where that interpretation is eminently reasonable in view of the covenant's language, purpose, and history.[40]

In resisting this conclusion, the opposing opinion takes too cramped a view of section 211 of the Second Restatement of Contracts. The opposing opinion justifies its approach in part by claiming that the written agreement is ambiguous, even in context. As stated above, I think not. But let's assume that it is. It is

---

[40] Contrary to the opposing opinion's suggestion, the government's purpose in drafting (and mandating the use of) Covenant 4 has been consistent from the outset. Had Kolbe researched the relevant federal policy in 2008 (a prospect that is both unpled and unlikely), he could have found the ample evidence of purpose and interpretation, from both HUD and FEMA, that Chief Judge Lynch discusses in her opinion. All that is "new" is that strained readings proffered in litigation have prompted the United States to come forward and reject, as inconsistent with that regulatory record, the position for which Kolbe now advocates.

precisely when a writing is ambiguous that the principle of section 211 has its greatest practical utility. After all, whenever the written agreement is plain and unambiguous, it will have only one meaning anyway. The benefit of the section 211 rule thus arises precisely in cases where the writing is sufficiently ambiguous to raise the prospect of non-uniform interpretations. If we were nevertheless to adopt the cramped view of section 211 proposed by the opposing opinion, we would reduce section 211 to a sort of Tom Sawyer, showing up only after most of the work is done.

The opposing opinion resists this characterization, reasoning that courts should circumvent section 211 only in "rare" cases, such as this one, in which "both parties reasonably understood the ambiguous language the same way." But it is, in my experience, anything but "rare" for a plaintiff in a contract case to argue that the other party to the contract could be found to have shared her subjective understanding.[41] My colleagues' understanding of section 211 would therefore take that provision out of play at the motion to dismiss stage in almost all cases, precisely when the benefits of predictability and standardization are most substantial. The limiting principle the opposing opinion offers is therefore hardly a limitation at all.

---

[41] Indeed, what is notable here is that Kolbe, seeking to maintain a class action, went out of his way to disclaim any such argument.

The Restatement secures more work for section 211 by rejecting what is the heart of the opposing opinion's analysis: the contention that subjective understandings of the individual parties might be employed to determine the meaning of this standard written contract. Leaving no doubt about the matter, the ALI drafters made that rejection express in section 211 itself. This is what they wrote: "Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing."

The opposing opinion does just the opposite: it not only pays regard to the parties' understandings, but it actually treats those understandings as controlling, relegating the uniform covenants to varying and eccentric interpretations. And the opposing opinion cites no authority for this rejection of section 211. Instead, the opposing opinion tries to argue by use of an analogy, suggesting that the unpleaded and unstated parallel subjective understandings of Kolbe and Taylor Bean are materially no different than a written supplemental agreement documenting such an understanding. But a written supplementation on a subject matter addressed by Covenant 4, apart from perhaps making the loan non-conforming, would itself preclude a finding that the parties manifested assent to a "regularly used" writing, rendering section 211 inapplicable.

Finally, the claim in the opposing opinion that we are "retroactively" "rewriting" Kolbe's agreement with Taylor Bean further evidences not just an unsupported hostility to the rule of section 211, but also a misapprehension of the facts. The rule today was the rule when Kolbe signed his mortgage. A party who "manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type . . . adopts the writing as an integrated agreement with respect to the terms included in the writing." § 211(1). Here, Covenant 4 was expressly labeled a "uniform" covenant that neither Kolbe nor Taylor Bean could delete from the agreement without imperiling financing. Even if we accept the contention that Covenant 4, in context, was materially ambiguous (which I do not), the controlling interpretative rule then, as now, was that the uniform meaning of the integrated writing would be resolved "without regard to" Kolbe's unwritten understanding. § 211(2). Not a word in the agreement has been rewritten. Moreover, the meaning of these words as a matter of law was the same then as it is now. In short, the fact that Kolbe's subjective understanding remains as irrelevant today as it was when he signed the agreement simply does not mean that the agreement has been changed in any way.

III.

In rejecting the full force of section 211, and in accepting a theory of the case not pleaded, the opposing opinion would, at the margins, harm consumers in two respects.

First, by disfavoring standardization and predictability in reading complaints and applying uniform agreements, the opposing opinion cuts at the margins against cost savings that benefit all. The ALI, which marshals the insights and perspectives not only of judges, but of law professors and practitioners, points us in a different direction. In the ALI's view, considerations of predictability and practicality have weight, and rules supporting those values are to be given effect. Id. cmt. a. ("Standardization of agreements serves many of the same functions as standardization of goods and services . . . . Operations are simplified and costs reduced, to the advantage of all concerned."). The opposing opinion, by contrast, inadvertently calls us to act in this respect to the disadvantage of "all concerned," save perhaps this plaintiff in this case. We rightly resist that call.[42]

Second, in the real world, interpreting standard agreements uniformly, and especially applying mandated covenants in accordance with their one, legally determined meaning will tend to

_____

[42] And common sense and experience suggest that, as a practical matter, the "win" urged by the majority opinion would likely be Pyrrhic for Kolbe, who clearly did not commence this class action to recover a few hundred dollars.

facilitate class actions when contract terms actually are breached. The overly creative manner in which the opposing opinion reads the complaint, if applied even-handedly, would make it unnecessarily difficult to maintain class actions in consumer contract cases. We have before us a class action complaint drafted by experienced counsel who recognize that, absent class certification, the case is without practical worth or purpose. Counsel therefore understandably went out of their way to make sure that no defense counsel or court could plausibly read the complaint as alleging any claims that in any way hinged on a nonuniform, extrinsic evidence such as Kolbe's individual, subjective understanding. Otherwise, even before the decision in Walmart, Inc. v. Dukes, 131 S. Ct. 2541 (2011), class certification in this case would have been hopeless.

If a court could nevertheless read even this complaint as alleging a claim by Kolbe based on subjective and unspoken understandings that could vary from borrower to borrower, then it would become quite difficult for counsel to draft pleadings that could not be read "to imply" individual issues. Such readings could be used by defendants to justify putting off class certification rulings until after extensive discovery. Nor could plaintiffs avoid this problem by disavowing any such individual understandings: defense counsel would simply turn the assertion of broad affirmative defenses into fodder for further speculation about individual interactions and glosses. Confronted with the

-92-

possibility that ambiguous and uniform contract language mandated by the government might be interpreted contrary to a defendant's reading, creating a class-wide, common breach, defense counsel could urge that each class member's "understanding" need be assessed individually to see if it paralleled that of the defendant, thereby trumping the uniform interpretation that would otherwise apply, and thereby cutting against class certification.

This is not to say that we reach the result we do in order to facilitate the maintenance of class actions. Instead, I simply point out that the claim in the opposing opinion that the result in this case favors large institutions over ordinary consumers represents an overly simplified analysis that ignores the wider picture. Both doctrinally and pragmatically, the opposing opinion's retooled and overly ambitious effort to rescue Mr. Kolbe's individual claim (for which it is not clear he has any damages) runs the risk of materially harming the interests of consumers in a broad variety of actions.

IV.

In sum, the opposing opinion substitutes speculation for pleaded allegations in reading the complaint, and then doubles down by substituting unstated individual understandings for predictable uniformity when interpreting a government-mandated, standard covenant. In rejecting both efforts, Chief Judge Lynch's opinion is both doctrinally correct and more pragmatically progressive.

**TORRUELLA, <u>Circuit Judge</u>, with whom LIPEZ, <u>Circuit Judge</u>, and THOMPSON, <u>Circuit Judge</u>, join.** I fully agree with the arguments set forth by Judge Lipez in his opinion and thus join it. Like him, I see this case as a classic contracts dispute between two private parties. Common law contract principles clearly dictate that, given Kolbe's evidently reasonable interpretation, his case should have been permitted to go forward.

I am nevertheless compelled to write separately to highlight the fact that the case garnered enough votes to convoke an en banc court and thereafter, by evenly divided votes, set aside the panel's decision, notwithstanding the clear mandate of the Rules of Appellate Procedure. These rules establish that "en banc hearing or rehearing is not favored and ordinarily will not be ordered," except in the rare circumstances where such procedure is warranted because it is "necessary to secure or maintain uniformity of the court's decisions," or where we encounter a case presenting a "question of exceptional importance." Fed. R. App. P. 35.

Clearly, en banc resolution was not required to maintain the uniformity in our case law.

It is telling that the opposing opinion totally fails to mention or explain why the issues decided by the panel are of "exceptional importance" within the meaning of Rule 35 warranting en banc consideration. This is indeed troublesome for it sends a message that this court will rehear a case and set aside a panel's

well-reasoned decision whenever it is unhappy with the result or would have simply decided the case differently. En banc consideration is not for the purpose of correcting panel decisions. Calderón v. Thompson, 523 U.S. 538, 569 (1998) (Souter, J., dissenting) ("[E]n banc rehearing process cannot effectively function to review every three-judge panel that arguably goes astray in a particular case."). Although it may seem that I am being unnecessarily fastidious by pointing out what is well-established jurisprudence, I am compelled to emphasize this point given that these requirements are vital in ensuring that these rules be equally applied to all litigants and issues raised by them.

For some time now, I have been troubled by what I see as the recurring unprincipled denial and granting of petitions for rehearing en banc, without any attempt to define and apply a set of objective criteria to determine when a case is of exceptional importance. See Igartúa v. United States, 654 F.3d 99, 105 (1st Cir. 2011) (Torruella, J., dissenting) ("Whether a question meets the standard of 'exceptional importance' should be determined by objective criteria, and should not depend -- as some have suggested -- on whether it is exceptional in the 'eye of the beholder' or because 'one knows it when one sees it.' Judging from a comparison of the cases in which we have granted or denied en banc review one cannot help but wonder if those are the criteria that are prevalent

in this circuit when considering en banc petitions."). See also United States v. Vega-Santiago, 519 F.3d 1, 7 (1st Cir. 2008) (Torruella, J., dissenting) ("The convocation of this particular en banc proceeding highlights the whimsical and uneven manner in which this circuit often applies the rehearing rules. Indeed, both the granting and denying of petitions for these extraordinary proceedings evince a double-standard with respect to which issues are deemed meritorious of such review. . . . In this case, before either the appellant or the appellee had the opportunity to seek en banc review, the court undertook a rather unusual procedure and ordered en banc rehearing sua sponte.").

A comparison of the issues involved in cases in which en banc petitions have been rejected with those in which we have allowed such revision clearly shows that we have had a double standard in applying the "exceptional importance" Rule 35 criteria. Compare SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010), United States v. Textron, 577 F.3d 21 (1st Cir. 2009), Aronov v. Napolitano, 562 F.3d 84 (1st Cir. 2009), United States v. Giggey, 551 F.3d 27 (1st Cir. 2008), Vega-Santiago, and Conley v. United States, 323 F.3d 7 (1st Cir. 2003), with Colón-Marrero v. Conty-Pérez, 698 F.3d 46 (1st Cir. 2012), Donahue v. United States, 660 F.3d 523 (1st Cir. 2011), Dehonzai v. Holder, 654 F.3d 121 (1st Cir. 2011), Igartúa, and Evans v. Thompson, 524 F.3d 1 (1st Cir. 2008). The present

case surely demonstrates this.  To say the least, this is an

unsettling practice.

**LIPEZ, <u>Circuit Judge</u>.** This putative class action is one of a number of breach-of-contract suits being brought against financial institutions nationwide by mortgagors who claim that they were improperly forced to increase flood insurance coverage on their properties.[1] The plaintiff in this case, Stanley Kolbe, asserts that Bank of America's demand that he increase his flood coverage by $46,000 breached both the terms of his mortgage contract and the contract's implied covenant of good faith and fair dealing. The district court concluded that the pertinent provision of the mortgage unambiguously permitted the lender to require the increased flood coverage and, hence, it granted the defendants' motion to dismiss the complaint.

Having closely examined the mortgage language at issue and the relevant context, we are persuaded that the mortgage is reasonably susceptible to an understanding that supports Kolbe's breach of contract and implied covenant claims. We therefore vacate the judgment of dismissal in favor of the Bank.[2]

---

[1] We address another one of these actions in a separate decision also issued today, <u>Lass</u> v. <u>Bank of America, N.A.</u>, No. 11-2037.

[2] Federal jurisdiction in this case is premised on the court's diversity jurisdiction over class actions alleging aggregated damages in excess of $5 million. <u>See</u> 28 U.S.C. § 1332(d).

The following facts are drawn from the allegations in the complaint.  See Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 45 (1st Cir. 2011).  In October 2008, appellant Kolbe borrowed $197,437 from a mortgage company to finance the purchase of his home in Atlantic City, New Jersey.  The loan is guaranteed by the Federal Housing Administration ("FHA"), an agency within the Department of Housing and Urban Development ("HUD"), and Kolbe's mortgage in all material respects tracks the FHA's Model Mortgage Form for single-family homes.  See FHA Single Family Origination Handbook 4165.1, App'x II, available at http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4165.1/416 51hbHSGH.doc (last visited Sept. 18, 2012); see also 24 C.F.R. § 203.17(a)(2)(i) (stating that FHA mortgages "shall be in a form meeting the requirements of the [Federal Housing] Commissioner").  Paragraph 4 of both the model mortgage form and Kolbe's agreement describes the borrower's obligation to maintain hazard insurance, in pertinent part, as follows:

> 4.  Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods

> to the extent required by the Secretary [of HUD].

Federal law required Kolbe to obtain flood insurance because his property is located in an area designated as a special flood hazard zone under the National Flood Insurance Act ("NFIA"). See 42 U.S.C. §§ 4001-4129.[3] The minimum amount of such insurance also is mandated by law. Under the NFIA, the flood coverage for a residential property securing a mortgage issued by a federally regulated lender must be in an amount at least equal to the outstanding principal balance of the loan, or $250,000, whichever is less. Id. §§ 4012a(b)(1), 4013(b)(2); 24 C.F.R. § 203.16a; 44 C.F.R. § 61.6. Kolbe's complaint states that he purchased coverage in an unspecified amount in excess of the minimum. See Compl. ¶ 26.

In August 2009, Kolbe's original mortgage company went bankrupt, and appellee Bank of America took over Kolbe's loan.[4] Through appellee Balboa Insurance Company, the Bank sent Kolbe notices in October and November 2009 stating that he was required to increase his flood insurance by $46,000 so that the total

---

[3] Technically, the statute requires the lender to require the borrower to obtain the insurance. See 42 U.S.C. § 4012a(b)(1).

[4] BAC Home Loans Servicing, LP, a wholly owned subsidiary of Bank of America, N.A., was the entity that originally took over the mortgage. BAC has now been merged into the Bank, and we thus refer to the defendant mortgage holder as "Bank of America" or "the Bank." Defendant Balboa Insurance Company also is a subsidiary of Bank of America. For convenience, we at times refer only to "the Bank" when describing acts allegedly performed by both defendants.

coverage would equal the replacement cost of his property as identified in his homeowner's insurance policy. The Bank warned that it would purchase the additional insurance itself, at an estimated cost to Kolbe of $237, if he did not acquire the insurance by December 6. The Bank further advised that the insurance it would purchase -- commonly known as "force-placed" or "lender-placed" insurance," see, e.g., Williams v. Certain Underwriters at Lloyd's of London, 398 F. App'x 44, 45 (5th Cir. 2010) (per curiam) -- might cost more and would likely be less comprehensive than coverage Kolbe could obtain on his own. In response to these notices, Kolbe bought the additional $46,000 in flood insurance.

In February 2011, Kolbe filed this action against Bank of America and Balboa on behalf of himself and others similarly situated for breach of the mortgage contract and breach of the contract's implied covenant of good faith and fair dealing. He claimed that his mortgage contract did not permit the Bank to demand increased coverage, and he alleged that the Bank had implemented a nationwide policy of compelling borrowers to maintain greater flood insurance than required by their mortgages or federal law. Kolbe's complaint asserted that the Bank was profiting from this improper policy because it often arranged for force-placed insurance to be purchased through its own affiliated companies and brokers.

The defendants moved to dismiss the complaint on the ground that Paragraph 4 of the mortgage unambiguously gives the lender the discretion to determine the amount of flood insurance the borrower must carry. In its written decision, the district court agreed that the hazard-insurance provision can only be reasonably interpreted to afford discretion to the lender. The court concluded that the reference to "any hazards" in the first sentence of the paragraph encompasses flooding,[5] and, consequently, it held that the second sentence gives the lender the right to require that flood insurance, like other types of hazard coverage, "be maintained in the amounts and for the periods that [the] Lender requires." The court then considered the paragraph's third sentence, which explicitly refers to flood insurance, and held that it "merely specifies the required minimum coverage for flood insurance" under federal law -- i.e., it imposes a floor on the Bank's discretion to set the amount of flood insurance.

On appeal, Kolbe insists that Paragraph 4 addresses flood insurance solely by means of the third sentence -- which explicitly references such coverage -- and not by means of the generally phrased "all hazards" language in the first sentence. Alternatively, he maintains that this understanding is one of two

_____

[5] As reproduced above, the first sentence states: "Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance."

reasonable constructions of the paragraph. Kolbe asserts that his interpretation supports his claim that the Bank breached the mortgage agreement and violated the contract's implied covenant of good faith and fair dealing by compelling him (and others similarly situated) to purchase flood insurance in excess of the outstanding loan balance. Hence, Kolbe argues that the district court erred in dismissing his complaint for failure to state a claim.

## II.

The issue in this case is one of straightforward contract interpretation. Appellant Kolbe asserts that the hazard and flood insurance sentences in Paragraph 4 are independent and, indeed, mutually exclusive. Appellees maintain that the flood insurance sentence is subordinate to the general hazard sentence, merely limiting the Bank's discretion by incorporating the minimum coverage required by federal law. Kolbe, in other words, argues that the contract does not permit the Bank to demand insurance beyond the amount "required by the Secretary," while appellees argue that the Bank may require any amount so long as the Secretary's minimum is met.

Whether the contract language at issue here is ambiguous is a question of law, Nye v. Ingersoll Rand Co., 783 F. Supp. 2d 751, 759 (D.N.J. 2011),[6] and, accordingly, our review of the

_____

[6] The parties agree that New Jersey law governs the state-law issue of contract interpretation because Kolbe's residence is located there, and Paragraph 14 of the mortgage provides that

district court's interpretation is de novo, <u>Sumitomo Mach. Corp. of Am., Inc.</u> v. <u>AlliedSignal, Inc.</u>, 81 F.3d 328, 332 (3d Cir. 1996).[7] A contract is ambiguous if it "is susceptible of more than one meaning or if it is subject to reasonable alternative interpretations." <u>United States</u> v. <u>Pantelidis</u>, 335 F.3d 226, 235 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Chubb Custom Ins. Co.</u> v. <u>Prudential Ins. Co. of Am.</u>, 948 A.2d 1285, 1289 (N.J. 2008). Under New Jersey law, extrinsic evidence of context may be considered in determining ambiguity if "such evidence provides 'objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'" <u>Am. Cyanamid Co.</u> v. <u>Fermenta Animal Health Co.</u>, 54 F.3d 177, 181 (3d Cir. 1995) (quoting <u>Mellon Bank, N.A.</u> v. <u>Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1011 (3d Cir. 1980)). We must "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract." <u>Conway</u> v. <u>287 Corporate Ctr. Assocs.</u>, 901 A.2d 341, 346 (N.J. 2006); <u>see</u> <u>also</u> <u>SmithKline Beecham Corp.</u> v. <u>Rohm & Haas Co.</u>, 89 F.3d 154, 159 (3d Cir. 1996) (stating that New Jersey law requires "courts [to] interpret a contract considering 'the objective intent manifested in the language of the contract in

---

"federal law and the law of the jurisdiction in which the Property is located" govern.

    [7] Our review of a district court's dismissal of a complaint is likewise de novo. <u>See</u> <u>Román-Oliveras</u>, 655 F.3d at 47.

light of the circumstances surrounding the transaction'" (quoting Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 767 F.2d 43, 47 (3d Cir. 1985))).

**A. Breach of Contract**

### 1. The Language

Kolbe argues that the first three sentences of Paragraph 4 plainly address hazard insurance and flood insurance separately -- with hazard insurance covered by the first two sentences and flood insurance covered by the third -- and that only the amount of hazard insurance is left to the discretion of the lender. For convenience, we again reproduce the pertinent language in full:

> 4. Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary [of HUD].

Multiple characteristics of the provision suggest that Kolbe's interpretation is correct. Importantly, the paragraph is structured to address two different categories of insurance, with the first and third sentences containing identical introductory language directing the borrower to insure "all improvements on the Property, whether now in existence or subsequently erected." The

-105-

repetition arguably denotes two parallel statements of coverage, each establishing a particular coverage requirement for the same property. The first two sentences also are distinct from the third because they address insurance required by the lender, while the third sentence addresses insurance required by the Secretary. The second sentence, referring to "This insurance," is written as a modification of the first sentence, addressing the required amount of the previously identified form of insurance. By contrast, the next sentence, referring to flood coverage, contains its own specification of amount -- "the extent required by the Secretary."

The view that Paragraph 4 imposes independent requirements for hazard and flood insurance is lent force by the title for the paragraph, which breaks out "fire" and "flood" from all other hazards. Each of those two specifically identified hazards is then explicitly referenced, separately, in one of the two parallel sentences. The fact that both "fire" and "flood" are mentioned in the title, but the "all hazards" sentence refers only to "fire," further supports the view that the flood coverage was handled by the separate, linguistically parallel third sentence.

Moreover, the word "also" in the flood-insurance sentence reinforces the independence of the two requirements by suggesting a separate, additional obligation -- i.e., in addition to the hazard insurance that is left to the lender's discretion for most types of hazards, the debtor must obtain flood insurance in the

requisite amount.  Indeed, if the flood-insurance sentence were meant merely to limit the discretion afforded in the prior sentence, it arguably would have been framed in direct relation to that sentence.  For example, it could have said: "Notwithstanding any requirements of the Lender, flood insurance must be obtained as required by the Secretary."  The sentence as drafted, however, is not framed as a qualification on the previous sentence, but as an independent, further requirement.

Bank of America argues that the first sentence in Paragraph 4, which applies generally to coverage against "hazards, casualties, and contingencies," must be understood to include flood insurance because flooding is embraced by any reasonable understanding of those terms.  Thus, the Bank asserts, the mortgage contract allows it to demand flood coverage as it chooses pursuant to the sentence stating that the hazard (or casualty or contingency) insurance "shall be maintained in the amounts and for the periods that Lender requires."  The third sentence, according to the Bank, minimally cabins its discretion by requiring flood insurance at least "to the extent required by the Secretary."

We think appellant has the better argument based on the language and format of the paragraph.  Nevertheless, we acknowledge that the Bank's interpretation can also be deemed reasonable. Floods unquestionably are a type of hazard, and they are thus literally within the scope of the first sentence.  Moreover, the

-107-

third sentence can be reasonably understood to declare the borrower's obligation to obtain flood insurance as required by the NFIA regardless of whether the lender requires any other form of hazard insurance, but not to override the lender's exercise of discretion to require more.

Because the language is not decisive, we consider what the available extrinsic evidence tells us about the meaning of the provision.

**2. The Extrinsic Evidence**

As a preliminary matter, we note that the mortgage and certain public materials outside the complaint may properly be part of our inquiry in reviewing the district court's disposition of a motion to dismiss. See, e.g., Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (stating that a district court may consider "documents incorporated by reference [in the complaint], matters of public record, and other matters susceptible to judicial notice" without converting a motion to dismiss into a motion for summary judgment (internal quotation marks omitted) (alteration in original)). We therefore refer liberally to publicly available HUD materials.

The debate over the clarity of Paragraph 4 centers on whether the reference to "any hazards" may reasonably be read to exclude the serious hazard of flooding. Kolbe argues that flood damage ordinarily is not covered by standard homeowners' hazard

insurance policies, and that it therefore is reasonable to conclude that such coverage is excluded from the mortgage contract's hazard insurance requirement.  The Bank responds that the absence of any explicit exclusion for flood coverage in the "any hazards" sentence is the best evidence that flooding is a hazard within the meaning of that sentence.

Kolbe's view is advanced by the distinctive treatment routinely given to flood insurance by HUD, the agency responsible for FHA programs.  Kolbe's mortgage contract contains standard HUD language specifying the mortgagor's insurance obligations.[8] Appellant points out that HUD's handbook for the "Administration of Insured Home Mortgages" treats hazard insurance and flood insurance separately.  For example, in a list of items linked to a home sale that must be escrowed, hazard insurance is listed as the first item and flood insurance is listed as the sixth item.  See HUD Handbook 4330.1, ch. 2, § 2-1(D), available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4330.1 (last visited Sept. 18, 2012).  The HUD handbook also contains a section labeled "Payment of Bills and Taxes from Escrow Accounts" that lists the two types of coverage separately.  See id. ch. 2, § 2-8(D) (Hazard Insurance) & (E) (Flood Insurance); see also id. at § 2-11(E) (separately

---

[8] Paragraph 4 is one of sixteen "uniform covenants" included in the FHA Model Mortgage Form for single-family homes.  See FHA Single Family Origination Handbook 4165.1, App'x II, supra.

listing "Dwelling Insurance," "Flood Insurance," and "Homeowner's Policies" under "Types of Coverage"). Similarly, HUD's sample settlement statement for a home purchase separately itemizes "Hazard Insurance Premium" on Line 903 and "Flood Insurance" on Line 904. See "Buying Your Home" (June 1997), Section III, a v a i l a b l e    a t   http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_12893.pdf (last visited Sept. 18, 2012).

HUD's practice of treating flood coverage separately reflects Congress's specific concern about such insurance, which led to the enactment of the NFIA in 1968. Following years of major floods that required "unforeseen disaster relief measures and . . . placed an increasing burden on the Nation's resources," Congress identified a widespread gap in private flood insurance coverage. 42 U.S.C. § 4001(a); see also H.R. Rep. No. 90-1585 (1968), reprinted in 1968 U.S.C.C.A.N. 2873, 2966-2967 (noting that "[h]eavy losses over the years from hurricanes in the coastal areas and from storms in inland areas of the Nation dramatize the lack of insurance protection against flood damage"). The legislators found that it was "uneconomic" for private insurers to make flood insurance available "on reasonable terms and conditions," 42 U.S.C. § 4001(b)(1), and they sought to bridge the gap through a cooperative program between the federal government and the

insurance industry, id. § 4001(b)(2).[9]  Thus, in effect, Congress found that floods were not customarily among the hazards protected by standard homeowners' insurance policies.  See Mitchell F. Crusto, The Katrina Fund: Repairing Breaches in Gulf Coast Insurance Levees, 43 Harv. J. on Legis. 329, 335 (2006) ("The insurance industry has generally excluded flood damage in a homeowners policy because flood insurance is not commercially viable."); US Gov't Accountability Office, GAO 07-1078, National Flood Insurance Program: FEMA's [Federal Emergency Management Agency] Management and Oversight of Payments for Insurance Company Services Should be Improved, at 8 (2007) (noting that "flooding is generally excluded from homeowner policies that typically cover damage from other losses, such as wind, fire, and theft").[10]

---

[9] Congress anticipated that the National Flood Insurance Program ("NFIP") authorized by the NFIA would rely on a pool of insurance companies "to assume a reasonable proportion of responsibility for the adjustment and payment of claims for losses."  42 U.S.C. § 4051(a)(2); see also id. § 4011 (authorizing the program).  Federal funds would subsidize the program.  Id. §§ 4054(a) (directing the Administrator of the Federal Emergency Management Agency to make periodic payments to the pool to ensure that "flood insurance [is] available on reasonable terms and conditions"); 4055(a) (authorizing reinsurance provided by the government for losses in excess of the pool's assumption of responsibility); see also Suopys v. Omaha Prop. & Cas., 404 F.3d 805, 807 (3d Cir. 2005) (noting that "[t]he NFIP is underwritten by the United States Treasury in order to provide flood insurance below actuarial rates").

[10] HUD also recognizes the standard industry practice in guidance about flood insurance requirements that is provided on its website:

Generally, homeowner and other property casualty

HUD's practice of treating flood insurance independently is pertinent to our interpretation of Paragraph 4 of the FHA's model language, see Pacifico v. Pacifico, 920 A.2d 73, 78 (N.J. 2007) (noting that the terms of a contract are to be examined "in light of the common usage and custom"); Kearny PBA Local No. 21 v. Town of Kearny, 405 A.2d 393, 400 (N.J. 1979) (listing custom and usage among the "interpretative devices" for discovering contractual intent), and Kolbe's interpretation has particular force where, as here, the mortgage separately addresses flood-insurance coverage. By contrast, if there were no explicit reference to flooding as a specific harm requiring insurance coverage, the assertion that flooding is not embraced by a reference to "any hazards" would be considerably less potent. That was the situation in Custer v. Homeside Lending, Inc., 858 So.2d 233 (Ala. 2003), on which the district court relied in rejecting the ambiguity of the language in Kolbe's mortgage.[11] The explicit

insurance policies do not provide coverage for potential financial loss that may be caused by flooding damage. Many of the private insurance companies are now marketing policies offered by the National Flood Insurance Program along with their own property casualty insurance policies.

http://portal.hud.gov/hudportal/HUD?src=/program_offices/comm_planning/environment/review/qa/floodinsurance (last visited Sept. 18, 2012).

[11] The comparable provision in Custer stated:

"7. That [the Mortgagor] will keep the improvements now existing or hereafter erected on the mortgaged property,

-112-

attention to flood insurance in Kolbe's mortgage materially distinguishes that case from this one.

The Bank, however, reasonably asserts that it makes no sense to read floods out of the "any hazards" sentence because it would be unreasonable to bar a mortgage provider from requiring more than the limited amount of insurance required by federal law, i.e., the amount of the outstanding loan balance. It argues that lenders have an interest in ensuring the long-term performance of mortgage loans by protecting the replacement value of the property, as it sought to do in this instance. It cites FEMA guidelines advising lenders to require replacement-value insurance. See Fed. Emergency Mgmt. Agency, National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines 27-28 (2007), available at http://www.fema.gov/library/viewRecord.do?id=2954 (last visited Sept. 18, 2012). Interagency guidance makes explicit that lenders may demand more flood insurance coverage than is required by law, stating that "[e]ach lender has the responsibility to tailor its own flood insurance policies and procedures to suit its business needs and protect its ongoing interest in the collateral." 74 Fed.

_____

> insured as may be required from time to time by the Mortgagee against loss by fire and other hazards, casualties and contingencies in such amounts and for such periods as may be required by the Mortgagee and will pay promptly, when due, any premiums on such insurance provision for payment of which has not been made hereinbefore."

Custer, 858 So.2d at 237 (emphasis in original).

Reg. 35914, 35936 (July 21, 2009), 2009 WL 2143410 (F.R.) (Question 16);[12] see also Notice, Loans in Areas Having Special Flood Hazards, 76 Fed. Reg. 64175, 64182 (Oct. 17, 2011) (Question 9) (noting that, "[i]n cases involving certain residential . . . properties, insurance policies should be written to, and the insurance loss payout would be the equivalent of, [replacement cost]").

We acknowledge that lenders may have good reason to require full replacement coverage. Nonetheless, in mandating minimum coverage in an amount "equal to the outstanding principal balance of the loan," 42 U.S.C. § 4012a(b)(1), Congress in the NFIA appears to have incorporated an assumption that, at times, a more limited amount of flood insurance may be reasonable and appropriate. The view that the amount of mandatory insurance should be kept to a minimum also is reflected in the insurance coverage section of HUD's Handbook, which provides that "[t]he mortgagee may not insist on more coverage than is necessary to protect its investment." HUD Handbook 4330.1, ch. 2, § 2-11(B), supra.[13]

---

[12] The FHA is not one of the agencies that issued the guidance. They were: Office of the Comptroller of the Currency, Treasury; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision, Treasury; the Farm Credit Administration, and the National Credit Union Administration.

[13] Of course, this statement may not mean that the insurance should be limited to the amount of the outstanding balance because, as discussed above, a lender may deem replacement-value coverage "necessary to protect its investment."

Indeed, it is plausible that the FHA, which prescribes Paragraph 4 as a "uniform convenant[] for national use," App'x at 31 (Kolbe mortgage), would have sought to balance the need for privately funded disaster relief with a concern that insurance costs not become a barrier to home ownership. HUD's mission, carried out through the FHA and other programs, is in part "to create strong, sustainable, inclusive communities and quality affordable homes for all." See HUD Mission, http://portal.hud.gov/hudportal/HUD?src=/about/mission (last visited Sept. 18, 2012). From the perspective of facilitating "affordable homes," Paragraph 4 as construed by Kolbe could reasonably be understood to reflect a policy choice to cap mandatory flood insurance at the amount of the outstanding loan balance.[14] See generally S. Rep. No. 87-281 (1961), reprinted in 1961 U.S.C.C.A.N. 1923, 1925-26 (discussing amendments to the National Housing Act of 1934 ("NHA") that, inter alia, created "a new FHA mortgage insurance program" to further "the national housing policy of 'a decent home and suitable living environment for every American family'"); Cienega Gardens v. United States, 503 F.3d 1266, 1270 (Fed. Cir. 2007) (noting that the 1961 amendments

---

[14] Indeed, the model Paragraph 4 used in Kolbe's FHA mortgage does not mandate any insurance for hazards other than floods, as it leaves any such requirement to the lender's discretion. See HUD Handbook 4330.1, ch. 2, § 2-8(D), supra ("While HUD does not require mortgagors to carry hazard insurance, the mortgage does permit mortgagees to require it.").

were designed to "'meet[] the housing needs of moderate-income families'" (quoting S. Rep. No. 87-281, <u>reprinted in</u> 1961 U.S.C.C.A.N. at 1926)).

The dissent invokes the industry practice of limiting "all-risk" policies by means of express flood-exclusion provisions to argue that, absent such an exclusion in the FHA model mortgage, "any hazards" in the first sentence of Paragraph 4 can only reasonably be read to include flooding. That view, however, reflects the dissent's basic flaw of ignoring the reasonable arguments in Kolbe's favor. It is plausible that HUD responded to the standard industry practice of treating floods as a distinct hazard by developing a mortgage document that deals with flood coverage separately from the coverage for other hazards. Indeed, as discussed above, the repetitive format of the "any hazards" and flood-insurance sentences in Paragraph 4 suggests parallel, independent obligations. Hence, contrary to the dissent's assertion, the general industry practice is no more helpful to the Bank's position than it is to Kolbe's.[15]

The extrinsic evidence thus leaves us in much the same place as our examination of Paragraph 4's text and structure. The HUD documents showing that the agency routinely treats hazard and

_____

[15] It bears repeating that we are reviewing the grant of a motion to dismiss. The Bank will have the opportunity to develop a record in support of its position and, if appropriate, to seek summary judgment.

-116-

flood insurance independently are persuasive evidence in support of Kolbe's assertion that Paragraph 4 separately addresses the two types of insurance and fixes the required amount of flood insurance at the statutory minimum amount. At the same time, however, the FEMA guidelines recommending replacement value coverage support the Bank's view that Paragraph 4 is not reasonably construed to prevent lenders from fully protecting their investments and, hence, must be read to give the lender discretion to increase the requirement above the statutory minimum.

The question, of course, is not what amount of flood insurance a lender reasonably could require, but what this particular HUD mortgage provision in fact permits the lender to demand. See Hofstetter v. Chase Home Fin., LLC, 751 F. Supp. 2d 1116, 1127 n.3 (N.D. Cal. 2010) ("Simply because an agency recommends that lenders maintain a certain amount of flood insurance coverage does not mean that lenders have carte blanche to do so without regard to the terms of their loan agreements with borrowers."). As to that question, we conclude that a rational jury could construe Paragraph 4 in favor of either Kolbe or the Bank. Though the text of Paragraph 4 and the extrinsic evidence both provide strong support for Kolbe's interpretation, his reading is not the only reasonable one.[16] See Morris v. Wells Fargo Bank,

---

[16] Indeed, the dissent plausibly marshals support for the Bank's interpretation of the mortgage language. It fails, however, to give comparable respect to the factors that favor Kolbe's

-117-

<u>N.A.</u>, No. 2:11-cv-00474 (W.D. Pa. Sept. 7,2012) (denying motion to dismiss breach of contract claim involving same language) (stating that, "[a]t the very least, plaintiff's interpretation is tenable"); <u>Wulf</u> v. <u>Bank of America</u>, 798 F. Supp. 2d 586, 588 (E.D. Pa. 2011) (same); <u>Skansgaard</u> v. <u>Bank of America</u>, No. C11-988 RJB, slip op. at 4 (W.D. Wash. Oct. 13, 2011) (same). Kolbe has therefore stated a plausible breach of contract claim, and, hence, the district court erred in dismissing his complaint on the ground that the mortgage unambiguously permitted the Bank to demand the additional $46,000 in coverage. <u>See</u> <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011) (holding that "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim" (citing <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662 (2009), and <u>Bell Atlantic Corp.</u> v. <u>Twombly</u>, 550 U.S. 544 (2007)).[17]

---

interpretation.

[17] Kolbe argues that any ambiguity in the mortgage should be construed against the Bank as the "drafter" of the agreement. The Bank argues in response that the doctrine giving the advantage to the non-drafting party in a dispute over language does not apply where the language at issue is prescribed by law. <u>See</u> <u>Restatement (Second) of Contracts</u> § 206(b) ("The rule that language is interpreted against the party who chose it has no direct application to cases where the language is prescribed by law, as is sometimes true with respect to insurance policies, bills of lading and other standardized documents."). Kolbe acknowledges that the "FHA required that the Mortgage Agreement conform to its requirements," Compl. ¶ 18, and we thus reject the doctrine as a basis for judgment against the Bank at this stage of the case. Kolbe remains free to re-argue the issue as warranted upon further development of the facts.

B. The Covenant of Good Faith and Fair Dealing

Kolbe alleges that the defendants acted in bad faith and consequently breached the implied covenant of good faith and fair dealing by demanding flood insurance in an amount in excess of the coverage required by his mortgage. The covenant, implied in every contract in New Jersey, imposes a duty on each party to refrain from "'destroying or injuring the right of the other party to receive the fruits of the contract.'" Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997) (quoting Palisades Props., Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)); see also Kalogeras v. 239 Broad Ave., L.L.C., 997 A.2d 943, 953 (N.J. 2010); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

The New Jersey Supreme Court has described good faith conduct as "conduct that does not 'violate community standards of decency, fairness or reasonableness,'" Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005) (internal quotation mark omitted) (quoting Restatement (Second) of Contracts § 205 cmt. a), and that is "'consisten[t] with the justified expectations of the other party,'" Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001) (quoting Restatement (Second) of Contracts § 205 cmt. a). In New Jersey, a showing of "'bad motive or intention' is vital to an action for

-119-

breach of the covenant." Brunswick Hills Raquet Club, 864 A.2d at 225 (quoting Wilson, 773 A.2d at 1130).

The Bank asserts that no jury could find that the Bank acted in bad faith by taking the objectively reasonable step of requiring insurance in the amount recommended by FEMA. We agree that, given the ambiguity in Paragraph 4, requiring replacement-value coverage would on its own fall short of demonstrating bad faith. Kolbe's claim, however, does not rest solely on the demand for increased coverage. The Bank warned Kolbe that if he failed to purchase additional coverage, force-placed insurance would be obtained, possibly through entities related to Bank of America, at a premium that "may be more expensive and will likely provide less coverage than . . . you can obtain on your own." App'x at 43 (Notice to Kolbe, Oct. 18, 2009).

This ultimatum could constitute bad faith under either of two scenarios. The first would be if the Bank, notwithstanding our conclusion that Paragraph 4 is ambiguous, had in fact believed that the mortgage required flood insurance coverage only in the amount of the outstanding principal balance of the mortgage (or $250,000, if that were the lower amount) and, hence, did not authorize the Bank's demand for additional coverage at additional expense to the borrower. Evidence that the Bank made the demand despite this belief, so that it might have the opportunity to gain financially from the purchase of insurance through its related entities, would

-120-

plainly suggest the "bad motive or intention" that is at the core of a breach of the implied covenant. See Brunswick Hills Raquet Club, 864 A.2d at 225. A finding of bad faith also would be supportable if the Bank had recognized the ambiguity in Paragraph 4 and, instead of acting out of concern for protecting its security, had seized upon the ambiguity as a money-making opportunity. Again, a decision to demand additional insurance for the purpose of generating business for its affiliated insurance companies, and thereby increase Bank profits, would reflect the improper motive necessary to demonstrate a breach of the covenant of good faith and good dealing.

We conclude that the allegations plausibly support such a contention of improper motivation: Kolbe alleges that the Bank demanded flood insurance in excess of his obligations under the contract, see Compl. ¶¶ 13, 25-26, 32,[18] that it did so in bad

---

[18] These paragraphs allege, in pertinent part, as follows:

13. Defendants have a nationwide policy and practice of requiring mortgagors of mortgages on real estate located in geographic areas designated by the United States government as having "special flood hazards" to maintain flood insurance coverage in an amount equal to the lesser of an amount established by Defendants or the maximum flood insurance coverage available under the National Flood Insurance Act of 1968 . . . . Defendants apply and enforce Defendants' Flood Insurance Coverage Requirement even if it exceeds the mortgagor's flood insurance coverage obligations and Defendant BAC Home Loans' flood insurance rights under the mortgage agreements.

25. [P]ursuant to the . . . provision of the

-121-

faith, id. ¶ 55,[19] and that the Bank or its related entities would profit through the purchase of force-placed insurance, id. ¶¶ 15, 16.[20] These allegations, in effect, amount to a claim that the

> Mortgage Agreement and the applicable FHA regulations, Plaintiff was required to maintain flood insurance coverage for the Property in an amount equal to the lesser of the outstanding balance on the Loan (less estimated land costs) or the $250,000 maximum flood insurance available under the Flood Insurance Act.
>
> 26. At all times . . . Plaintiff has maintained flood insurance coverage on the Property in excess of the outstanding balance of the Loan . . . . That flood insurance coverage was greater than the amount of flood insurance that Plaintiff was contractually obligated to maintain on the Property pursuant to the Mortgage Agreement and the above-referenced applicable FHA regulations.
>
> 32. Defendants' requirement that Plaintiff purchase additional flood insurance was neither required by, nor permitted by, the Mortgage Agreement. . . . [T]he Mortgage Agreement requires Plaintiff to maintain flood insurance coverage of at least the outstanding balance of the Loan less estimated land costs. Plaintiff was already maintaining this level of flood insurance coverage on the Property when the Defendants sent him the October 18 and November 16, 2009 letters. Accordingly, Plaintiff was fully satisfying his flood insurance coverage obligation under the Mortgage Agreement and fully fulfilling the Defendant BAC Home Loans' flood insurance coverage rights under the Mortgage Agreement.

[19] Paragraph 55 alleges:

> By requiring Plaintiff and the Class to maintain and pay for flood insurance coverage in excess of the coverage required by their mortgage agreements, Defendants acted in bad faith and breached the implied covenant of good faith and fair dealing contained in the mortgage agreements.

[20] These paragraphs allege:

Bank's motivation for demanding additional flood insurance coverage was to increase corporate profits by funneling new coverage to its own affiliates.[21]  See, e.g., Abels v. JPMorgan Chase Bank, N.A., 678 F. Supp. 2d 1273, 1276, 1278-79 (S.D. Fla. 2009) (declining to dismiss claim alleging breach of implied covenant where plaintiffs asserted that defendant "engaged in self-dealing by purchasing insurance from one of its own affiliates"); cf. Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 9 (1st Cir. 2011) (holding that "plaintiff's implied covenant claims founder because his complaint

_____

15. Defendants enforce Defendants' Flood Insurance Coverage Requirement by demanding that the mortgagors obtain the amount of flood insurance coverage required by Defendants.  If the mortgagors fail to comply with Defendants' demand, Defendants purchase flood insurance coverage so that the total insurance coverage on the real estate will meet Defendants' Flood Insurance Coverage Requirement.  Defendants then charge the mortgagors for the cost of that additional insurance by either deducting the insurance premiums from the escrow accounts maintained by the mortgagors with Defendant BAC Home Loans or by increasing the mortgagors' monthly mortgage payments.

16. Defendants or their corporate subsidiaries or affiliates profit when Defendants buy insurance for mortgagors. Defendants often purchase the insurance from Defendants' own affiliated insurance companies, including Defendant Balboa, and/or place the insurance through Defendants' own affiliated insurance brokers. Defendants' affiliated insurance brokers receive commissions on these insurance transactions and Defendants' affiliated insurance companies, including Balboa, receive the insurance premiums involuntarily paid by the mortgagors.

[21] Appellant argues that this alleged self-dealing would breach the implied covenant even if the mortgage gave the Bank the authority to require increased amounts of flood insurance.

contains only a threadbare allegation that 'the defendant terminated [him] in bad faith . . . unaccompanied by any factual allegations that might give rise to an inference of bad-faith conduct").[22]

The Bank contends that such a self-dealing claim fails as a matter of law because Kolbe responded to the Bank's ultimatum by purchasing the insurance himself, and the Bank therefore did not benefit from Kolbe's acquisition of additional insurance. The Bank cites no cases in support of its implicit contention that bad-faith conduct designed to provide an opportunity for self-dealing cannot constitute a breach of the implied covenant of good faith and fair dealing under New Jersey law. Kolbe's decision under duress to avoid the higher cost of force-placed insurance would seem an inadequate defense if the Bank's motivation were improper. In any event, in the absence of developed argument from the Bank, no more needs to be said on this issue at this early stage of the case.

We thus conclude that the complaint alleges sufficient facts to establish a breach of the covenant of good faith and fair dealing that is "'plausible on its face,'" Iqbal, 556 U.S. at 678

---

[22] The equivalent allegations in the other flood insurance case we decide today, Lass v. Bank of America, N.A., No. 11-2037, are more explicit. The plaintiff there alleged that the Bank had breached the covenant of good faith and fair dealing by, inter alia, "charging borrowers sham 'costs' for flood insurance that did not reflect the true cost to Bank of America because a portion of such 'costs' were retained by Bank of America and/or its affiliates (or kicked back to them) as commissions or 'other compensation.'" Compl. ¶ 75, App'x at 45.

(quoting <u>Twombly</u>, 550 U.S. at 570).  Hence, the claim should not have been dismissed.

## III.

Defendants argue that the district court's judgment in favor of Balboa should be affirmed even if the complaint is reinstated against Bank of America.  We agree.  Balboa's alleged involvement in the matters underlying Kolbe's lawsuit was limited to preparing and sending the letters notifying Kolbe that he needed to purchase additional flood insurance.  <u>See</u> Compl. ¶ 29.  Those letters were sent on the letterhead of the Bank's predecessor, BAC Home Loans Servicing, LP.  The complaint is devoid of allegations showing a contractual relationship between Kolbe and Balboa, and Kolbe's bald assertion that Balboa "acted on its own behalf" in "all of the actions described herein," <u>id.</u> ¶ 21, is inadequate to state a plausible claim against the insurer for breach of contract or breach of the implied covenant of good faith and fair dealing.[23]  Hence, we affirm dismissal of the complaint against Balboa.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.  Costs are awarded to the appellant.

<u>So ordered</u>.

---

[23] Of course, the allegations concerning Balboa's role in providing force-placed insurance at the Bank's behest remain relevant to the implied covenant claim against the Bank.